UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

VANESSA ENOCH, *et al.*,
    Plaintiffs,

Case No. 1:16-cv-661
Litkovitz, M.J.

vs.

HAMILTON COUNTY
SHERIFF'S OFFICE, *et al.*,
    Defendants.

**ORDER**

Plaintiffs Vanessa Enoch and Avery Corbin bring this action under 42 U.S.C. § 1983 and

Ohio law seeking injunctive relief and civil damages for alleged violations of their rights. The

claims arise out of plaintiffs' warrantless arrests and searches and seizures of their electronic

recording devices by defendants in the hallways of the Hamilton County, Ohio Courthouse.

Defendants are the Hamilton County Sheriff's Office; Hamilton County Sheriff Jim Neil in his

official capacity only; and Hamilton County Deputy Sheriffs Hogan and Nobles in their official

and individual capacities. The matter is before the Court on (1) defendants' motion for summary

judgment (Doc. 83), plaintiffs' response in opposition (Doc. 96), and defendants' reply (Doc.

99); (2) plaintiffs' motion for partial summary judgment (Doc. 84) and supporting exhibits (Doc.

95), defendants' response in opposition (Doc. 94), and plaintiffs' reply (Doc. 98); and (3)

defendants' motion for sanctions for spoliation and failure to preserve electronically stored

information (ESI) (Doc. 92), plaintiffs' response in opposition (Doc. 97), and defendants' reply

(Doc. 100).

## I. Procedural background

Plaintiffs filed an amended complaint in this matter on January 6, 2017. (Doc. 38).

Defendants filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) on January

20, 2017. (Doc. 41). The Court issued an Order on May 18, 2017, granting the motion in part

and denying the motion in part. (Doc. 61). The Court granted the motion as to plaintiffs' claims against defendant Neil in his individual capacity and the claims against all defendants under Count IV - Excessive Force-Fourth Amendment; Count VII - State Law Claim: Malicious Prosecution; Count IX - State Law Claim: False Imprisonment/False Arrest; and Count XI - State Law Claim: Assault and Battery. The Court denied the motion as to plaintiffs' § 1983 claims against defendant Neil in his official capacity and their claims against defendants Hogan and Nobles in their individual capacity under Count I - Violation of Free Speech Rights-First and Fourteenth Amendments; Count II - Violation of Fourth Amendment Rights; Count III - False Arrest/Unlawful Detention/False Imprisonment-Fourth Amendment; and Count V - Malicious Prosecution-Fourth and Fourteenth Amendments; plaintiffs' claim against defendant Neil in his official capacity under Count VI - Ratification-Fourth and Fourteenth Amendments; and plaintiffs' claims under Count VIII - State Law Claim: Negligent and Intentional Infliction of Emotional Distress; and Count X - State Law Claim: Invasion of Privacy. (*Id.*). The Court determined that defendants Hogan and Nobles were not entitled to qualified immunity from liability in their individual capacity on these claims.

Defendants filed an interlocutory appeal on the issue of qualified immunity on May 31, 2017. (Doc. 64). The Court of Appeals affirmed this Court's Order on appeal in a decision issued on March 23, 2018. *Enoch v. Hogan*, 728 F. App'x 448 (6th Cir. 2018). First, the Court of Appeals found that defendants were not entitled to qualified immunity with regard to plaintiffs' claims of Fourth Amendment violations based on unreasonable search and seizure, false arrest and malicious prosecution. *Id.* at 453. The Court of Appeals found that defendants Nobles and Hogan raised only one defense to these claims—that they were enforcing Local Rule 33(D)(6) of the Hamilton County Court of Common Pleas, which prohibits recording in the

courthouse hallway without prior permission—and there was a factual issue as to whether the Rule prohibited the conduct that was the basis for plaintiffs' arrests. *Id.* at 454. The Court of Appeals found that because plaintiffs had alleged facts indicating defendants lacked probable cause to arrest and prosecute plaintiffs, and because it was clearly established that arrest and prosecution without probable cause are unconstitutional, plaintiffs had plausibly alleged violations of their clearly established Fourth Amendment rights. *Id.* at 454-55.

Second, the Sixth Circuit determined that plaintiffs had stated a plausible claim for violation of their clearly established First Amendment rights. *Id.* at 455-57. The Court accepted for purposes of the motion plaintiffs' allegations that they had violated no rule or law. Based on this assumption, the Court of Appeals found that to "constitutionally prevent [plaintiffs] from or punish them for gathering news about matters of public importance" violated their clearly established constitutional rights. *Id.* at 456. The Court found that it had been clearly established for some time that:

> [T]he First Amendment protects the rights of both the media and the general public to attend and share information about the conduct of trials, "where their presence historically has been thought to enhance the integrity and quality of what takes place." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 578 (1980). The Court linked the right of access to another fundamental First Amendment right, explaining that "[t]he explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily." *Id.* at 576-77. The same logic necessitates finding a constitutional violation in this case, where Enoch and Corbin's access to a press conference held immediately after a hearing was foreclosed on the basis of their race.

*Enoch*, 728 F. App'x at 456. The Court of Appeals also found it has long been established that while a state or instrumentality may regulate the use of its public facilities, "state officials may not enforce rules or regulations that implicate First Amendment rights in a racially discriminatory manner." *Id.* (citing *Brown v. Louisiana*, 383 U.S. 131, 143 (1966)). The Court

determined that on the facts alleged, "state officials purported to enforce state law in a racially discriminatory manner, stopping and arresting black citizens for engaging in behavior that was both protected by the First Amendment and permitted for their white counterparts." *Id.* at 456.

The Sixth Circuit concluded that plaintiffs plausibly alleged violations of their clearly established First and Fourth Amendment rights. *Id.* at 457. The Court of Appeals affirmed this Court's denial of qualified immunity and remanded the case for further proceedings consistent with its opinion. (*Id.*; *see* Docs. 66, 68).

The following claims alleged in the amended complaint (Doc. 38) remain pending: (1) a First Amendment claim for violation of plaintiffs' right to free speech based on their detention/arrest and search and seizure of their iPads, which plaintiffs allege occurred without a warrant or probable cause (Count I); (2) a Fourth Amendment claim for violation of plaintiffs' right to be free from unreasonable searches and seizures based on the alleged search and seizure of plaintiffs and their personal belongings, which plaintiffs allege occurred without a warrant or probable cause (Count II); (3) a Fourth Amendment Claim for false arrest and false imprisonment (Count III); (4) a Fourth Amendment claim for malicious prosecution based on defendants' acts of charging plaintiffs with criminal offenses and pursuing criminal prosecutions despite allegedly knowing there was no factual or legal basis for the charges (Count V); (5) Fourth and Fourteenth Amendment claims against defendants Neil and Hamilton County for ratifying the defendant deputies' alleged unconstitutional acts by failing to investigate their conduct or take any remedial or disciplinary action against them (Count VI); (6) a state law claim for negligent and intentional infliction of emotional distress (Count VIII); (7) a state law claim for invasion of privacy based on the search of plaintiffs' iPads (Count X); and (8) a claim for punitive damages against each of the individual defendants for committing the acts described in

4

the complaint in willful, wanton and reckless disregard of plaintiffs' rights (Count XII). Plaintiffs allege that at all relevant times, the individual defendants were acting under color of state law. (*Id.*). Plaintiffs allege that defendant Neil exercises final policymaking authority for the Hamilton County Sheriff's Office and for Hamilton County, Ohio. (*Id.*).

## II. Disputed and undisputed facts

In their motions for summary judgment and supporting and opposing memoranda, the parties offer different versions of the events that give rise to plaintiffs' claims. The parties' arguments suggest there is little agreement on the facts in this case and that many of the material facts are in dispute. Consideration of the admissible evidence produced by the parties, particularly the video footage and deposition testimony, clarifies many of the discrepancies in the parties' accounts and provides irrefutable evidence of the events that occurred on June 25, 2014 which are at issue in this case. After having considered the probative evidence, including the video footage and the deposition testimony, the Court finds there is no genuine dispute as to the following material facts except where noted.

Plaintiffs Enoch and Corbin are African-American residents of Ohio. At the time of the events giving rise to the complaint, Enoch was reporting on and researching the criminal case of *State of Ohio v. Tracie Hunter* (the *Hunter* case) in the Hamilton County, Ohio Court of Common Pleas. Hunter, a former Hamilton County Juvenile Court judge, was indicted on numerous felony counts and ultimately convicted on one count. Corbin was Hunter's former bailiff. Defendant Neil at all relevant times has been the Sheriff of Hamilton County, Ohio. Defendants Hogan and Nobles were at all relevant times deputies employed by the Hamilton County Sheriff's Office. Hamilton County Common Pleas Judge Norbert Nadel presided over the *Hunter* trial.

On June 25, 2014, a pretrial hearing was held in the *Hunter* case at the Hamilton County Courthouse (Courthouse). Plaintiffs Enoch and Corbin attended the hearing and had their iPads with them. On the date of the pretrial hearing, the Hamilton County Court of Common Pleas Local Rule 33(D)(6), titled "Cell Phones, Cameras, Pagers, Laptop Computers, and Other Electronic Devices," was in effect.[1] *Enoch*, 728 F. App'x at 453 n.1. The rule reads, in its entirety:

> a. Unless otherwise permitted in accordance with Rule 30 of these Local Rules, the operation of any cellular or portable telephone, camera (still or video), pager, beeper, computer, radio, or other sound or image recording or transmission device is prohibited in any courtroom or hearing room, jury room, judge's chambers or ancillary area (to be determined in the sole discretion of the Court) without the express permission of the Court. All such devices must be turned off in the above-listed areas at all times.
>
> b. Duly licensed attorneys and their paralegals/assistants appearing in court, courthouse employees, public safety officers, authorized contractors and vendors, court staff, and any others authorized by the Court are exempt from the prohibition set forth above unless ordered by the Court.
>
> c. Any person or persons violating this Rule are subject to sanctions for contempt and or criminal prosecution, and may be ejected from any restricted area described above or from the courthouse, and any item or device operated in violation of this Rule may be confiscated by court staff or courthouse security personnel and held until the offending person(s) leave(s) the courthouse. In no event shall the Court or any court or security personnel be liable for damage to any device confiscated and/or held in accordance with this Rule.

*Id.* The cross-referenced Rule 30, titled "Media Coverage of Court Proceedings,"[2] provides at Subsection A:

> Requests for permission to broadcast, televise, photograph, or otherwise record proceedings in the courtroom shall be made in writing to the Judge or the Judge's designated courtroom employee. Such a request shall be made on the appropriate application form available through the Court Administrator. Such applications should be made as far in advance as is reasonably possible but in no event later than 30 minutes prior to the courtroom session to be recorded.

---

[1] *See* https://hamiltoncountycourts.org/index.php/commonpleas-local-rule-33.
[2] *See* https://hamiltoncountycourts.org/index.php/common-pleas-local-rule-30.

The Judge involved may waive the advance notice provision for good cause. All applications shall become part of the record of the proceedings.

*Id.*

It is undisputed that Judge Nadel instructed the individuals in attendance at the hearing that there were prohibitions on the use of cell phones and photographing inside the courtroom. It is also undisputed that Judge Nadel did not issue a written order or verbally instruct attendees of the *Hunter* trial proceedings, including the June 25, 2014 pretrial hearing, regarding a prohibition on the use of cell phones, cameras, and other types of electronic recording devices in "ancillary areas" under Local Rule 33(D)(6). Judge Nadel was deposed in this case, and he testified that he did not recall issuing an order or verbally instructing individuals present in the courtroom during the *Hunter* proceedings that they could not use cell phones or recording devices in the Courthouse hallways. (Doc. 88-1, Nadel Depo., p. 12, 28-32, PAGEID#: 1425, 1441-45). He testified that the record would accurately reflect what had occurred. (Doc. 88-1, Nadel Depo., pp. 12, 31-32, PAGEID#: 1425, 1444-45). Judge Nadel testified that he did not recall putting on an order in the *Hunter* case that specifically defined "ancillary areas," but the record would accurately reflect any orders he issued. (Doc. 88-1, Nadel Depo., pp. 16-17, 20, 21, PAGEID#: 1429-30, 1432, 1433). He did not reference "hallways" in the instructions he gave in his courtroom regarding the issue of cell phones or recording proceedings. (Doc. 88-1, Nadel Depo., pp. 27-29, PAGEID#: 1440-42). He considered "the hallway, any adjacent areas to be ancillary to the courtroom" and thought that was implicit in his order, but he did not verbalize his understanding. (Doc. 88-1, Nadel Depo., pp. 21, 29-30, PAGEID#: 1434, 1442-43). He thought Rule 33(D) would allow him to make the judgment that hallways are ancillary areas, and he "would say it's implicit that the ancillary areas are part of the courtroom." (Doc. 88-1, Nadel Depo., p. 21, PAGEID#: 1434). However, he acknowledged that whatever the record of

7

proceedings reflected controlled. (Doc. 88-1, Nadel Depo., p. 22, 32, PAGEID#: 1435, 1445).

Judge Nadel explained that only a presiding judge can hold an individual in contempt of an order the judge issues, and individuals could be held in contempt if they violated an entry or order he issued prohibiting recording in his courtroom. (Doc. 88-1, Nadel Depo., pp. 22, 24, PAGEID#: 1435, 1437). The transcript of Judge Nadel's verbal instruction to individuals in the courtroom regarding photographs and video recordings does not mention hallways. (Doc. 75, Nobles Depo., pp. 122-123, PAGEID#: 651-52; Doc. 81-19, Defts. Exh. 3).

Plaintiff Enoch recalled that prior to or at the beginning of the June 25, 2014 hearing, Judge Nadel came into the courtroom and reminded those in attendance that "nobody should be taking photographs in here" and "if you need to use your . . . cell phones, then . . . you need to step out into the hallway. . . ." (Doc. 78, Enoch Depo., p. 51, PAGEID#: 823). She recalled Judge Nadel stated that if individuals had their cell phones out in the courtroom, the phones would be confiscated. (Doc. 78, Enoch Depo., p. 51, PAGEID#: 823).

Deputy Sheriff Nobles testified that he first received an instruction or order from Judge Nadel regarding using recording devices in the hallways at the beginning of the *Hunter* trial, when Judge Nadel gave a verbal instruction to all those then present in the courtroom. (Doc. 75, Nobles Depo., pp. 26-27, PAGEID#: 555-56). Nobles does not recall what, if any, instructions Judge Nadel gave regarding the use of recording devices in the hallways. (Doc. 75, Nobles Depo., pp. 28-29, PAGEID#: 557-558). Nobles recalls Judge Nadel mentioning "recording, picture taking" and instructing "they weren't allowed," but Nobles does not remember that Judge Nadel "ever specifically [said] where they weren't allowed." (Doc. 75, Nobles Depo., pp. 28-29, PAGEID#: 557-558). Nobles does not know if Judge Nadel gave any instructions or orders regarding the use of recording devices at any other time during the *Hunter* trial. (Doc. 75,

Nobles Depo., p. 29, PAGEID#: 558).

Defendant Hogan testified that up to the time he arrested plaintiff Corbin, he had not seen "any written orders or entries from Judge Nadel that specifically prohibited recording in the hallways." (Doc. 76, Hogan Depo., p. 58, PAGEID#: 712). Hogan acknowledged that Local Rule 33(D)(6) does not mention hallways, and Hogan never saw a directive from Judge Nadel describing "ancillary areas" under Local Rule 33(D)(6) as they would relate to a prohibition on recording during the *Hunter* trial. (Doc. 76, Hogan Depo., pp. 70-71, PAGEID#: 724-725). Hogan testified that he thought that Corbin was violating Local Rule 33(D)(6) at the time he arrested him in the hallway. (Doc. 76, Hogan Depo., p. 71, PAGEID#: 725).

On June 25, 2014, two signs were posted on Judge Nadel's courtroom door where the *Hunter* pretrial hearing took place. The first sign read:

THE
COURTROOM

ABSOLUTELY NO
FOOD OR
DRINKS
ALLOWED IN
COURTROOM

Below that was a sign that read:

USE OF CELL PHONES, PAGERS,
CAMERAS, ELECTRONIC DEVICES
ARE PROHIBITED WITHOUT
PERMISSION OF THE COURT

VIOLATORS ARE SUBJECT TO
CONTEMPT, SEIZURE
OR EJECTION
**HAMILTON COUNTY LOCAL RULE 33(D)6**

Rule effective November 3, 2012

(Doc. 84-11, Pl. Exh. 11, PAGEID#: 1236).

From here, the parties' versions of the events surrounding plaintiffs' arrests diverge. Enoch gave the following testimony at her deposition about her actions during the hearing and then in the hallways outside the Courtroom just prior to her arrest. This portion of Enoch's deposition testimony is not disputed. Enoch likely had her cell phone and iPad in the Courtroom on the day of the hearing, but she did not take any pictures in the Courtroom. (Doc. 78, Enoch Depo., p. 23, PAGEID#: 795). She believes that Hunter's attorney, Clyde Bennett, "said something about doing a press conference" after the hearing, and her intent was to capture a press conference if it were to occur. (Doc. 78, Enoch Depo., pp. 31, 36, PAGEID#: 803, 808). However, Bennett did not hold a press conference after the hearing. (Doc. 78, Enoch Depo., p. 40, PAGEID#: 812). Enoch had left the hearing a few minutes early to use the restroom and apparently was in the public hallway of the Courthouse when individuals left the courtroom after the hearing. (Doc. 78, Enoch Depo., p. 36, PAGEID#: 808). Enoch took pictures in the hallway with either her iPad or cellphone. (Doc. 78, Enoch Depo., p. 21, 27-30, PAGEID#: 793, 799-802; Doc. 81-43, Defts. Exhs. 4A-K).

At his deposition, defendant Hogan described what he observed in the hallway of the Courthouse on June 25, 2014, that purportedly led him to arrest Corbin and call for assistance. (Doc. 76, Hogan Depo.). Hogan's version of the following events leading to plaintiffs' arrests is disputed, including the following version he initially gave at his deposition. Hogan initially testified that when he exited the courtroom, he "witnessed a group of people that had Mr. [Kimball] Perry[3] surrounded with their iPads in his face, not letting him leave the hallway." (Doc. 76, Hogan Depo., p. 37, PAGEID#: 691). The group included Corbin. (Doc. 76, Hogan

---

[3] On the date in question, Perry was a reporter with The Cincinnati Enquirer. (Doc. 75, Nobles Depo, p. 93, PAGEID#: 622).

Depo., pp. 37-38, PAGEID#: 691-692). Hogan first observed Corbin in the hallway toward the front of the courtroom. (Doc. 76, Hogan Depo., p. 44, PAGEID#: 698). Corbin "had his iPad in Mr. Perry's face asking him how it felt, not letting him move down the hallway." (Doc. 76, Hogan Depo., p. 39, PAGEID#: 693). When Hogan saw that "they" would not let Perry walk down the hallway, he told them to stop filming, and "when they wouldn't stop filming [] it turned into a confrontation." (Doc. 76, Hogan Depo, pp. 44-45, PAGEID#: 698-99). Other individuals were in this circle of people as well, but when Hogan "told them to stop [recording], most of the people stopped and went on their way." (Doc. 76, Hogan Depo., p. 38, PAGEID#: 692). Hogan asked Corbin to stop filming, and Corbin eventually complied with Hogan's request to stop recording Perry. (Doc. 76, Hogan Depo., pp. 44, 48, PAGEID#: 698, 702). Other than the group that was around Perry, Hogan did not observe anyone using recording devices in the hallway around this time period, and at no time did he ask anyone outside of this group to stop recording. (Doc. 76, Hogan Depo., p. 48-49, PAGEID#: 702-703). Hogan did not observe Corbin do or say anything else that he thought was unlawful, but Hogan thought the "filming of Mr. Perry" was unlawful "[b]ecause they were not letting him move. . . . They weren't letting him walk down the hallway. They had him surrounded with multiple iPads in his face asking him how it felt, like they were taunting him." (Doc. 76, Hogan Depo., p. 40, PAGEID#: 694).

Hogan's version of his interactions with plaintiff Enoch is also disputed. Hogan testified that when he first saw Enoch, she was in the side hallway outside the courtroom. (Doc. 76, Hogan Depo., p. 46, PAGEID#: 700). She was in the circle of people surrounding Kimball. (Doc. 76, Hogan Depo., pp. 38, 46, PAGEID#: 692, 700). Hogan told the entire group to stop taking pictures, but he did not see whether Enoch was actually taking any pictures and he did not address her specifically. (Doc. 76, Hogan Depo., p. 46-47, PAGEID#: 700-701). He does not

11

know if Enoch stopped taking pictures when he asked the group in the hall to stop taking pictures. (Doc. 76, Hogan Depo., pp. 56-57, PAGEID#: 710-11). Hogan testified he did not have any direct verbal interaction with Enoch. (Doc. 76, Hogan Depo., pp. 46-47, PAGEID#: 700-701). Hogan pointed out to Deputy Nobles those individuals who had been filming in the hallway. (Doc. 76, Hogan Depo., p. 57, PAGEID#: 711). He did not instruct Nobles to pull Enoch aside and take her iPad. (Doc. 76, Hogan Depo., p. 57, PAGEID#: 711). Hogan does not know if Enoch stopped taking pictures at this time. (Doc. 76, Hogan Depo., p. 57, PAGEID#: 711). Hogan was not involved in the decision to arrest Enoch. (Doc. 76, Hogan Depo., p. 58, PAGEID#: 712). He testified at his deposition, though, that he observed her violate the law by engaging in disorderly conduct "[w]hen they would not let Kimball Perry walk through the hallway and they had their iPads in his face." (Doc. 76, Hogan Depo., p. 60, PAGEID#: 714). Hogan testified that this was the only law he saw Enoch violate. (Doc. 76, Hogan Depo., p. 60, PAGEID#: 714).

It is undisputed that before Hogan had placed Corbin under arrest, Corbin had identified himself and produced identification at Hogan's request. (Doc. 76, Hogan Depo., p. 55, PAGEID#: 709). After Corbin produced his identification, Corbin took a picture of the courtroom door. (Doc. 76, Hogan Depo., pp. 49-50, PAGEID#: 703-04). Hogan took Corbin's iPad from him and handcuffed him. (Doc. 76, Hogan Depo., pp. 50-51, PAGEID#: 704-705). The only action Corbin took that was not compliant with Hogan's directives was taking pictures of the courtroom door. (Doc. 76, Hogan Depo., p. 51, PAGEID#: 705). Hogan did not arrest Corbin until he took pictures of the courtroom door. (Doc. 76, Hogan Depo., p. 54, PAGEID#: 708). After his arrest, Hogan took Corbin to Room 260 of the Courthouse and issued a citation for disorderly conduct. (Doc. 76, Hogan Depo., pp. 51, 53, PAGEID#: 705, 707). In the

narrative portion of the citation, Hogan wrote that, "Mr. Corbin did engage in disorderly behavior outside of room 260 (sic) causing a disruption." (Doc. 76, Hogan Depo., pp. 53-54, PAGEID#: 707-08; Doc. 81-28, Pl. Exh. 15).

After viewing videotape of the events surrounding Corbin and Enoch's arrests (Doc. 81-16, Pl. Exh. 9, Doc. 81-30, Pl. Exh. 17), Hogan testified that the video footage demonstrated that his recall and description of the events he testified about were not entirely accurate and that the video evidence showed the following facts to be true: Corbin did not approach Perry when Perry exited Judge Nadel's courtroom. (Doc. 76, Hogan Depo., pp. 66-67, PAGEID#: 720-21). Nor did Corbin inhibit Perry from advancing or going anywhere, and the video does not show a circle of people taking videos of Perry. (Doc. 76, Hogan Depo., pp. 68-69, PAGEID#: 722-723). Corbin followed behind Perry as he was walking down the hallway and around a corner. (Doc. 76, Hogan Depo., p. 67, PAGEID#: 721). Corbin stood in the hallway facing Perry and recorded him, while Perry also took pictures or video of Corbin. (Doc. 76, Hogan Depo., pp. 68-69, PAGEID#: 722-723). Hogan had not placed Corbin under arrest at the time Corbin complied with his request to stop recording. (Doc. 76, Hogan Depo., pp. 55, 61, PAGEID#: 709, 715). Hogan testified that he told a woman who had been filming (Enoch) and walking down the hall to not go anywhere and to come over to him. (Doc. 76, Hogan Depo., p. 62, PAGEID#: 716). Hogan saw on the videotape that he had a conversation with Enoch in the hallway as she stood "well behind [Hogan] and Kimball Perry." (Doc. 76, Hogan Depo., pp. 67-68, PAGEID#: 721-722). A Caucasian man in a red shirt can be seen using a camera filming in the hallway. (Doc. 76, Hogan Depo., pp. 62-63, PAGEID#: 716-717). Hogan testified that he did not know if the man worked for a news station, but he was not asked at any point to stop filming and at no point did Hogan ask him for any proof that Judge Nadel had authorized him to film in the hallways.

13

(Doc. 76, Hogan Depo., p. 63, PAGEID#: 717). A second Caucasian man who was not wearing a media badge can be seen standing next to the first man and recording, but Hogan did not ask him if he had authority from Judge Nadel to film in the hallways. (Doc. 76, Hogan Depo., p. 64, PAGEID#: 718). Hogan saw on the videotape that there was not a circle of people taking videos of Perry but that only Corbin was taking videos when Hogan asked him to stop, and at that point Perry, who is Caucasian, was also taking a picture of Corbin. (Doc. 76, Hogan Depo., pp. 68-69, PAGEID#: 722-723).

Hogan testified about a narrative report prepared by Perry, identified as the "victim" on the report, of the events leading up to the arrest of Corbin. (Doc. 76, Hogan Depo., p. 41, PAGEID#: 695, Doc. 81-29, Pl. Exh. 16). The report is dated July 15, 2014, and Hogan testified that Perry prepared the report outside Hogan's presence and Hogan signed or printed his name at the bottom as the reporting officer. (Doc. 76, Hogan Depo., p. 41, PAGEID#: 695). In the report, Perry states that he exited into the hallway after covering a hearing and saw Corbin and two women shooting video and taking photos with iPads. (Doc. 76, Hogan Depo., p. 43, PAGEID#: 697; Doc. 81-29, Pl. Exh. 16, PAGEID#: 989). Perry states he started to leave after a few minutes, and "That's when Corbin started chasing me down the hallway with his iPad right in my face." (Doc. 76, Hogan Depo., p. 43, PAGEID#: 697; Doc. 81-29, Pl. Exh. 16).

Defendant Nobles provided deposition testimony about his interaction with and arrest of plaintiff Enoch, portions of which are not disputed. (Nobles Depo., Doc. 75). Defendant Nobles testified that he responded to a "trouble run," or to an area in the Courthouse where trouble was occurring, on the date of the arrests. (Doc. 75, Nobles Depo., pp. 47-48, PAGEID#: 576-577). When he arrived, defendant Hogan and Deputy Sheriff Ferguson were questioning Corbin. (Doc. 75, Nobles Depo., pp. 48, PAGEID#: 577). Nobles recalled asking Hogan "if

14

anybody was taking any pictures or recordings and he said, yes, and he pointed to Vanessa

Enoch." (Doc. 75, Nobles Depo., p. 48, PAGEID#: 577). Nobles asked the question because he

"was responding to a trouble run" and according to Nobles, "the Judge's orders were not to take

any recordings or pictures," a factual assertion the parties dispute. (Doc. 75, Nobles Depo., pp.

48- 49, PAGEID#: 577-578). The "orders" Nobles referenced was the oral statement that Judge

Nadel had made from the bench at the outset of the trial. (Doc. 75, Nobles Depo., p. 49,

PAGEID#: 578). Nobles' narrative report indicates that when he asked the question, Hogan

pointed to Enoch. (Doc. 75, Nobles Depo., p. 49, PAGEID#: 578). According to Nobles, Hogan

said that Enoch was taking pictures or recording. (Doc. 75, Nobles Depo., p. 49, PAGEID#:

578). Nobles never observed plaintiff Enoch taking pictures. (Doc. 75, Nobles Depo., p. 53,

PAGEID#: 582). Based on Hogan's information, Nobles approached Enoch and asked her if she

had taken any pictures. (Doc. 75, Nobles Depo., p. 50, PAGEID#: 579). According to his

report, Enoch asked Nobles why he was asking her this. (Doc. 75, Nobles Depo., p. 50,

PAGEID#: 579). Nobles responded it was because she had been identified as taking pictures.

(Doc. 75, Nobles Depo., p. 52, PAGEID#: 581). Nobles wrote in his report that Enoch told him

she did not take any pictures. (Doc. 75, Nobles Depo., pp. 53, 122, PAGEID#: 582, 651).

Nobles does not remember if he observed other people using recording devices in the hallway

during the time he interacted with Enoch. (Doc. 75, Nobles Depo., pp. 92-93, PAGEID#: 621-

22). Prior to his arrest of Enoch, he did not ever "check and see who Judge Nadel had expressly

authorized to use recording devices in and around his courtroom during the *Hunter* trial." (Doc.

75, Nobles Depo., p. 94, PAGEID#: 623).

Nobles and Enoch disagree on many of the other facts surrounding Enoch's arrest.

Nobles wrote in his report that he asked Enoch for her name, which he alleges she refused to

give him. (Doc. 75, Nobles Depo., p. 53, PAGEID#: 582). Nobles testified he does not recall

whether Enoch ever said that she had her identification in her purse or ever offering to get it for

him. (Doc. 75, Nobles Depo., pp. 53-54, 57, PAGEID#: 582-583, 586). He believed she

committed a crime by failing to verbally identify herself. (Doc. 75, Nobles Depo., p. 54,

PAGEID#: 583). After Enoch purportedly failed to identify herself, Nobles told her that he was

going to take her into custody so that he could identify her, and he directed Enoch to put her

hands behind her back. (Doc. 75, Nobles Depo., p. 54, PAGEID#: 583). Enoch had not

threatened the officer or anyone else in the area at that point. (Doc. 75, Nobles Depo., p. 55-56,

PAGEID#: 584-85). Nobles indicated in his report that Enoch initially refused to put her hands

behind her back, and he told her to do so because "I needed to identify her and explain the

courthouse rules to her." (Doc. 75, Nobles Depo., p. 56, PAGEID#: 585). He testified that if he

could not verify her identity, her fingerprints would be taken and she would be identified that

way. (Doc. 75, Nobles Depo., p. 57, PAGEID#: 586). After he and another officer cuffed

Enoch, Nobles escorted her to Room 260, the court services office, although that is not an office

where fingerprints could be taken. (Doc. 75, Nobles Depo., p. 58, PAGEID#: 587). Nobles

testified that he took Enoch to Room 260 because that is where officers take individuals to be

searched or if anything needs to be done when the officer writes a ticket or takes the individual

into custody. (Doc. 75, Nobles Depo., p. 59, PAGEID#: 588). Enoch was transported to Room

260 without incident: she cooperated in walking down to Room 260, she did not make a violent

physical gesture toward anyone, and she did not verbally threaten anyone before being placed in

cuffs. (Doc. 75, Nobles Depo., p. 60-61, PAGEID#: 589-90).

Nobles testified that he "actually confiscate[d] [Enoch's] iPad at the time" of her arrest.

(Doc. 75, Nobles Depo., p. 102, PAGEID#: 631). Nobles testified that the reason he

"confiscated [Enoch's] belongings was the same reason I handcuffed her, was for everybody's safety, so it doesn't get dropped or knocked down or used as a weapon." (Doc. 75, Nobles Depo., p. 101, PAGEID#: 630). He does not recall asking Enoch if he could see the contents of her iPad or directing her to show him the contents to make sure no pictures had been taken. (Doc. 75, Nobles Depo., p. 102, PAGEID#: 631). Enoch's fingerprints were never taken, and her handcuffs were removed and she was permitted to leave once the citation was completed. (Doc. 75, Nobles Depo., p. 107, PAGEID#: 636).

Enoch testified at her deposition that she took pictures in the hallway with either her iPad or cellphone. (Doc. 78, Enoch Depo., pp. 21, 27-32, PAGEID#: 793, 799-804; Doc. 81- 43, Pl. Exh. 4A-K). She testified that when Deputy Sheriff Nobles asked her to hand over her iPad, she initially refused. (Doc. 78, Enoch Depo., p. 49, PAGEID#: 821). Enoch testified she gave the iPad to Nobles because he told her if she did not open it he was going to arrest her. (Doc. 78, Enoch Depo., p. 50, PAGEID#: 822). Nobles searched through the photos on her iPad and said he was looking for videos. (Doc. 78, Enoch Depo., p. 50, PAGEID#: 822). He asked Enoch three or four times whether she had any videos, and she said she did not take any videos. (Doc. 78, Enoch Depo., p. 50, PAGEID#: 822). Enoch testified that after Nobles searched through all of the photos, he stated that Enoch did not have any videos on her iPad. (Doc. 78, Enoch Depo., p. 50, PAGEID#: 822). Enoch testified when she asked Nobles why she was being arrested, "he said he didn't know yet. They'd figure it out when they got downstairs. And when he got downstairs, they were having conversations to try and figure out what they were going to charge me with." (Doc. 78, Enoch Depo., p. 33, PAGEID#: 805). On the videotape of Enoch's arrest, she is heard telling people behind her as she and Corbin are led onto an elevator in handcuffs that they were being arrested for taking pictures in the hallway. (Doc. 81-16, Pl. Exh. 9). Enoch

testified at her deposition that she had not been told this but this is what she believed at the time. (Doc. 78, Enoch Depo., p. 33, PAGEID#: 805).

Nobles charged Enoch with disorderly conduct in violation of Ohio Rev. Code. § 2917.11 and failure to identify herself to a law enforcement officer in violation of Ohio Rev. Code § 2921.29. (Doc. 75, Nobles Depo., pp. 39, 40, 61, PAGEID#: 568, 569, 590). The charges are dated June 27, 2014. (Doc. 75, Nobles Depo., p. 39, 40, 42, PAGEID#: 568, 569, 571; Doc. 81-7, Pl. Exh. 1). He prepared a second citation on June 30, 2014. (Doc. 75, Nobles Depo., pp. 84-85, PAGEID#: 613-614; Doc. 81-13, Pl. Exh. 6A). Nobles did not reference a violation of Local Court Rule 33(D)(6) in the arrest report, the citations, or the supplement. (Doc. 75, Nobles Depo., p. 87, PAGEID#: 616). He did not observe Enoch use any of the devices listed in Rule 33 in Judge Nadel's courtroom or in the hallway during the *Hunter* trial. (Doc. 75, Nobles Depo., p. 90, PAGEID#: 619).

Nobles viewed video footage of the incident in the hallway at his deposition. (Doc. 75, Nobles Depo., p. 94, PAGEID#: 623, Doc. 81-16, Pl. Exh. 9). Nobles testified that he did not witness any of the interaction between defendant Hogan and Corbin until Nobles is seen coming in on the video. (Doc. 75, Nobles Depo., pp. 95-96, PAGEID#: 624-625). Nobles does not "remember any deputy asking anyone, other than Enoch and Corbin, to stop using their recording devices in the hallway at any point during these events." (Doc. 75, Nobles Depo., p. 99, PAGEID#: 628). He also does not know whether any deputy asked any of the individuals seen in the video (Pl. Exh. 9) using recording devices if they had the judges' authority to use those recording devices. (Doc. 75, Nobles Depo., p. 99, PAGEID#: 628).

On or about August 1, 2014, all of the charges against Enoch and Corbin were dismissed. (Doc. 38 at ¶¶ 34, 38).

### III. Defendants' motion for sanctions/spoliation of evidence (Doc. 92)

On January 29, 2019, defendants moved the Court to impose a sanction of dismissal of this action or a presumption that evidence which plaintiffs failed to preserve was unfavorable to Enoch and Corbin. The evidence in question is electronically stored information (ESI) and the iPads used to collect the ESI. Defendants allege that on unspecified dates, they requested plaintiffs' ESI and their iPads during discovery with the intent of submitting the iPads to an expert witness for analysis. (Doc. 92 at 1, citing Exhs. A, B, C, D). Plaintiffs responded that in connection with plaintiffs' Fed. R. Civ. P. 26 disclosures, defendants were provided time-stamped video recordings taken on June 25, 2014 and photographs, including the photographs taken by Enoch with her iPad on June 25, 2014. (Doc. 92, Exhs. A-D). Enoch alleged that she no longer had either the iPad or cell phone that she had with her on June 25, 2014. (Doc. 92, Exh. C). Enoch testified at her deposition that between that date and the filing of this lawsuit, she swapped out her iPad and cell phone for newer models as the technology was updated or when she had problems with the devices. (Doc. 78, Enoch Depo., pp. 23-26, PAGEID#: 795-798). Corbin alleged he no longer had his iPad in his possession because one year after the June 25, 2014 incident, he returned the iPad to the Verizon store and upgraded to a new iPad. (Doc. 92, Exh. D). Corbin also alleged the video he was taking in the hallway on June 25, 2014 was not saved to his iPad. Corbin testified at his deposition that he lost this video when he complied with defendants' directive to close his iPad. (Doc. 77, Corbin Depo., p. 27, PAGEID#: 758). Defendants argue that plaintiffs' failure to preserve their iPads warrants sanctions under the Civil Rules.

Fed. R. Civ. P. 37(e) governs the preservation and potential sanctions for spoliation of electronically stored information (ESI). The Rule provides:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;
    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As an initial matter, the duty to preserve evidence only arises where the evidence is either relevant to ongoing litigation or may be relevant to future litigation. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). Defendants argue that the iPads and plaintiffs' "use of the iPads are relevant to resolving the issues in this case," which defendants characterize as: (1) whether plaintiffs were "working together"; (2) whether plaintiffs entered into a plan with others to harass Perry; (3) whether there were additional videos and photographs on the electronic devices that were withheld by plaintiffs; (4) when the iPads were accessed; (5) whether an "ongoing dispute described by Plaintiff Corbin began in the Courtroom and spilled into the hallway afterwards" and "the persons involved"[4]; (6) whether Enoch had oral permission to photograph during court proceedings, was allowed to sit in the media area, and took no pictures or video during court proceedings; and (7) whether Corbin's iPad's delete function actually functioned in the manner he described. (Doc. 92 at 2-4, citing deposition excerpts and exhibits). Defendants note that the

---

[4] Defendants allege that Corbin was using his iPad when Perry left the courtroom, and an individual by the name of Kevin Tidd "reported that while the hearing was ongoing, the media complained that Plaintiff Corbin was photographing them or video recording them inside the courtroom." (Doc. 92 at 8, citing PAGEID#: 1637).

exchange between defendant Hogan and plaintiff Enoch was video recorded (Pl. Exh. 7), but no audio between the two can be heard. (Doc. 92 at 5, PAGEID#: 1634). Defendants hypothesize that because plaintiffs' iPads "were on and much closer, the contents of that exchange would likely have been audible on their recordings." (Doc. 92 at 5, PAGEID#: 1634, citing Doc. 78, Enoch Depo., PAGEID#: 798; Pl. Exh. 7; Doc 81-46, PAGEID#: 1042; Doc. 77, Corbin Depo., PAGEID#: 759). Defendants argue that because the videos that have been submitted into evidence depict plaintiffs "using their iPads with screens showing [r]eporter Perry, those images and that video should have been preserved." (Doc. 92 at 7, PAGEID: 1636, citing Doc. 81-44 through 47, PAGEID#: 1040-1043; Doc. 81-14, PAGEID#: 966). Defendants also allege that Enoch's "iPad screen was glowing" but she asserted she took no video, and the only pictures she produced were of reporter Perry even though she asserted that she was "photographing everyone involved" in the Hunter trial. (Doc. 92 at 7-8, PAGEID#: 1635-36, citing Doc 78, Enoch Depo., PAGEID#: 800; Doc. 81-43, Exhs. 4A-K, PAGEID#: 1029-1039).

Defendants, as the movants, bear the burden of proof on spoliation. *See Yoe v. Crescent Sock Co.*, No. 1:15-cv-3, 2017 WL 5479932, at *9 (E.D. Tenn. Nov. 14, 2017) (citing *Byrd v. Alpha Alliance Inc. Corp.*, 518 F. App'x 380, 84 (6th Cir. 2013)). As outlined above, defendants posit seven different ways the iPad information may be relevant. (Doc. 92 at 3-4, PAGEID#: 1632-33). Item numbers 1, 5, and 6 involve ESI purportedly reflecting conduct occurring in the courtroom, including whether plaintiffs were "working together." However, the factual basis for plaintiffs' First and Fourth Amendment claims and their related state law claims, and the defenses thereto, involve plaintiffs' conduct in the hallways outside of Judge Nadel's courtroom. Defendants have not explained how information on whether plaintiffs and other individuals were "working together," were engaged in a dispute that carried from the courtroom into the hallway,

or took pictures or video during the court proceedings is relevant to the claims at issue in this case. Both Nobles and Hogan testified at their depositions that they relied on nothing more than what is shown in the videos that have been produced in this matter and were shown to them at their depositions to charge plaintiffs with disorderly conduct. Further, for reasons explained *infra*, whatever occurred in the courtroom is not material to the resolution of plaintiffs' claims against these defendants. Defendants have not carried their burden to show that the iPads and ESI that plaintiffs allegedly failed to preserve are relevant. There was no duty to preserve ESI reflecting actions or occurrences in Judge Nadel's courtroom.

Item number 7 involves whether the delete function on Corbin's iPad operated in the manner he described. Corbin alleged he lost the video he was taking in the hallway on June 25, 2014 when he complied with defendants' directive to close his iPad. Defendants allege that iPads automatically save video and photographs if put to sleep or turned off while recording. (Doc. 92 at 4, PAGEID#: 1633). Again, defendants do not explain how the functionality of Corbin's iPad device is relevant to the claims in this case. Assuming, arguendo, defendants may have wanted this information for impeachment purposes, they have not shown that that information could not be "replaced through additional discovery," Fed. R. Civ. P. 37(e), or that they were prejudiced in the absence of this ESI. A person knowledgeable about information technology could certainly opine on how the recording function of an iPad works and whether Corbin's description was consistent with this opinion.

Item number 2 involves potential electronic communications regarding a plan to "harass" reporter Perry. Defendants have failed to show how this ESI is relevant to the claims or defenses in this case. As described *infra*, plaintiffs' Fourth Amendment claims depend on the facts and circumstances within defendants Hogan and Nobles' knowledge at the time plaintiffs were

arrested; therefore, any undisclosed alleged plan to harass reporter Perry has no bearing on whether defendants had probable cause to arrest plaintiffs. The First Amendment claim involves whether plaintiffs had a right to use recording devices in the hallways outside the courtroom and any alleged plan to harass reporter Perry is simply not relevant. There was no duty to preserve any ESI communications about reporter Perry.

Item number 3 involves "additional videos, photos, or audio" on the electronic devices that were allegedly withheld by plaintiffs. Defendants only speculate as to the existence of relevant evidence that plaintiffs allegedly failed to preserve. Defendants concede that a video recording of plaintiffs' arrest is preserved on Exhibit 7, but they surmise that "[s]ince the iPads of Plaintiff Enoch and Corbin were on and much closer, the contents of that exchange *would likely have been audible* on their recordings." (Doc. 92 at 5, PAGEID#: 1634) (emphasis added). Enoch has denied that she made any video recordings, and there is no indication that Nobles found any video recordings on her iPad. Enoch represented in her discovery responses that she took no videos or recordings with her cell phone or iPad on June 25, 2014, and she had produced all photos taken by her with her iPad on that date. (Doc. 92, Exh. C). Corbin admits he recorded video on his iPad in the hallway outside the courtroom on June 25, 2014, but the video was never saved on his iPad because the officer had him turn his iPad off. (Doc. 77, Corbin Depo., p. 26, PAGEID#: 757). Defendants appear to question the veracity of plaintiffs' deposition testimony in their brief, but defendants have not produced any competent evidence that calls the credibility of plaintiffs' deposition testimony into question.[5] Defendants can only speculate as to whether

---

[5] Deposition testimony that members of the media reportedly observed Corbin filming them in the courtroom is not competent evidence and, in any event, any such testimony is not material to plaintiffs' Fourth Amendment, First Amendment and state law claims presented in this case. The Court further finds that defendants' assertion that "Kevin Tidd reported that members of the media complained that during the hearing the [sic] some people sitting in the press section were using iPads to photographing and video the media" (Doc. 92 at 3, PAGEID#: 1632, citing Doc. 81-27, PAGEID#: 987) is inadmissible hearsay.

there is additional video footage and what it would show. Because there is no evidence that relevant video recordings or photographs were on the electronic devices that plaintiffs no longer have, defendants have not shown that plaintiffs were obligated to preserve their iPads.

In any event, defendants again fail to articulate how any additional ESI found on the electronic devices would be relevant to the claims or defenses in this case. To the extent defendants allege they lawfully arrested plaintiffs because plaintiffs took photographs or recorded video in the hallways of the Courthouse, neither Enoch nor Corbin dispute they used their electronic devices to record in the hallway. The content of such video, photographs, or audio that allegedly existed on the iPads or Enoch's phone is simply not relevant to whether defendants Hogan and Nobles had probable cause to arrest plaintiffs for their conduct in the hallways. Likewise, defendants fail to allege how the actual content of those recording devices is somehow relevant to plaintiffs' First Amendment claims or their defenses thereto. Without any showing of potential relevance, the failure to preserve does not warrant sanctions under Rule 37(e).

Item number 4 - when the iPads were accessed - is potentially relevant to Enoch's state law privacy claim. Plaintiffs' First Amended Complaint alleges that Hogan and Nobles searched Enoch's iPad when Enoch was in custody in Room 260. (Doc. 38, ¶ 26). Enoch alleges she had a privacy interest in the iPad's contents that defendants violated when they viewed the contents without Enoch's permission. (Doc. 38, Count X). To the extent defendants dispute they examined the contents of Enoch's iPad (Doc. 83 at 20), a forensic examination of the iPad may have revealed the date and time Enoch's iPad was accessed and whether it was accessed during the time Enoch was in Room 260 after being taken into custody. Thus, the existence of Enoch's iPad and a forensic exam may be relevant to Enoch's state law privacy claim. However,

24

defendants have made no attempt to show that the ESI they seek could not be "replaced through additional discovery." Fed. R. Civ. P. 37(e). Defendants have not presented evidence to show they have explored feasible alternatives for obtaining the forensic information they allegedly seek, such as from the cloud. The Advisory Committee to the 2015 Amendments to the Federal Rules of Civil Procedure noted that "[b]ecause electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note. "This factor does not require [a party to] pursue every possible avenue for replacing or restoring the ESI, but it must show that it made some good-faith attempt to explore its alternatives before pursuing spoliation sanctions." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 109 (E.D. Va. 2018). Defendants have not met their burden of showing they made a good faith effort to pursue alternatives and have found "such evidence cannot be restored or replaced," which is a prerequisite for sanctions under Rule 37(e).

Assuming, *arguendo*, defendants had met their burden of establishing the predicate elements to Rule 37(e) sanctions – that plaintiffs did not preserve relevant evidence that defendants could not reproduce or obtain through additional discovery – defendants have not met their burden of showing plaintiffs had the intent to deprive defendants of the information's use in the litigation. Fed. R. Civ. P. 37(e)(2). Defendants argue that plaintiffs acted with the requisite intent because "the electric devices and information was [sic] not preserved." (Doc. 92 at 4, PAGEID#: 1633). As relief for the alleged spoliation of this evidence, defendants ask solely for relief that is specified in Rule 37(e)(2): that the Court either dismiss this action or, in the alternative, apply a presumption that the missing ESI was unfavorable to plaintiffs. (Doc. 92 at 8, PAGEID#: 1637).

"Rule 37(e)(2) sanctions are available to address the prejudicial effect of lost ESI only if the loss is shown to have been motivated by an intent to deprive another party of the information's use in the litigation." *Culhane v. Wal-Mart Supercenter*, No. 2:17-cv-13061, 2019 WL 1097488, at *3 (E.D. Mich. Jan. 10, 2019) (citation omitted). The Advisory Committee's Note on Rule 37(e)(2) provides that "[t]his subdivision authorizes courts to use specified and very severe measures to address or deter failures to preserve electronically stored information, but *only* on finding that the party that lost the information *acted with the intent to deprive another party of the information's use in the litigation.*" (emphasis added).

The current record before the Court shows at most negligence on the part of plaintiffs in the loss of the iPad information and not an intent to deprive defendants of use of that information in this litigation. Defendants claim Enoch "should have known" to preserve her iPad because "it might" have evidence relevant to defendants. (Doc. 92 at 7, PAGEID#: 1636). Claiming that Enoch "should have known" to preserve her iPad suggests mere negligence and not an intent to deprive defendants of potentially relevant evidence.[6] Defendants allege Corbin did not preserve his iPad either (Doc. 92 at 7), but they do not allege any facts or present any evidence establishing the requisite intent for imposing the severe sanctions they seek. As the Advisory Committee Notes makes clear, "Negligent or even grossly negligent behavior does not logically support that inference." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note. In addition, the circumstances between the time of plaintiffs' arrests and filing of their respective lawsuits suggest no more than negligence in the disposition of their electronic devices. Plaintiffs filed

---

[6] Defendants allege that Enoch "decided to file suit and consulted an attorney within three days after the event" (Doc. 92 at 7, citing Doc. 78 at PAGEID#: 798), suggesting Enoch should have been aware of the preservation obligations. However, it appears Enoch's testimony on this point relates to information she provided to the attorney representing her in the then-pending criminal matter who was "pursu[ing] the criminal side of it," and Enoch did not know that the attorney "was really interested in pursuing" the civil case. (Doc. 78, Enoch Depo., p. 27, PAGEID#: 799).

their respective actions nearly two years after their arrests on June 25, 2014, and they initially proceeded with these consolidated actions pro se. Both testified that they replaced their electronic devices when they had problems or upgraded to new technology over this two-year period. The Advisory Committee Notes caution courts to "be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note. Defendants have not presented any direct or circumstantial evidence suggesting that Enoch and Corbin were motivated to replace their iPads and cell phones in order to deprive defendants of relevant evidence. Corbin and Enoch's acts of trading in and upgrading their iPads and cell phones, which defendants only speculate may have had relevant ESI on them, do not constitute evidence that they intended to deprive defendants of the information's use in litigation so as to invoke Rule 37(e)(2) remedial measures. Defendants have not carried their burden to show that plaintiffs lost any relevant ESI with a culpable state of mind. Their request for sanctions under Rule 37(e)(2) is denied.

In addition, defendants' motion for sanctions based on spoliation is not timely. While Rule 37 governs motions for discovery sanctions, the Rule does not provide a timeline for filing a motion for sanctions based on spoliation of evidence. *Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F. Supp.3d 987, 995 (N.D. Ohio 2016) (citing *Goodman v. Praxair Servs., Inc.*, 632 F. Supp.2d 494, 506 (D. Md. 2009)). In making a discretionary determination as to whether a spoliation motion is timely under Rule 37, courts have identified five factors to consider: (1) "how long after the close of discovery the relevant spoliation motion has been made"; (2) "the temporal proximity between a spoliation motion and motions for summary judgment"; (3)

whether a spoliation claim was "made on the eve of trial," in which event the court should be "wary" of the claim; (4) whether a deadline for spoliation motions was included in the court's scheduling order under Fed. R. Civ. P. 16(b) or local rule; and (5) any explanation offered by the movant for why the motion was not filed earlier. *Id.* at 995 (quoting *Keck v. Gander Mtn. Co.*, No. 4:13-cv-0185, 2015 WL 6756151, *4 (N.D. Ohio 2015)). "[T]here is a particular need for [spoliation] motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion." *Stevenson v. Brennan*, No. 06-15182, 2018 WL 1887418, at *6 (E.D. Mich. Apr. 20, 2018) (quoting *Goodman*, 632 F. Supp.2d at 508).

In this case, defendants could have inquired about plaintiffs' iPads long before the close of discovery on November 15, 2018, by discovery methods other than depositions. Regardless, defendants knew no later than November 5, 2018, based on Corbin's discovery responses that he had traded his iPad in and upgraded to a new one approximately one year after the *Hunter* trial and his June 25, 2014 arrest. (Doc. 92, Exh. D, PAGEID#: 1677). Defendants knew as of September 21, 2018, that Enoch no longer had either the iPad or cell phone that she had with her on June 25, 2014 based on her answer to Request for Production 9(B). (Doc. 92, Exh. C, PAGEID#: 1674). Further, defendants were aware that video recordings of the incidents giving rise to plaintiffs' complaints existed, and defendants Nobles and Hogan had viewed video footage and testified about it at their depositions. Yet, defendants did not file their spoliation motion related to the possible existence of additional video evidence and other ESI until after the discovery deadline had passed on November 15, 2018. (*See* Doc. 70). Even then, defendants did not act before the dispositive motion deadline expired on January 15, 2019. (*Id.*). Instead, defendants inexplicably waited until two weeks after plaintiffs had filed their motion for partial

summary judgment (Doc. 84) to move for sanctions based on plaintiffs' alleged spoliation of ESI. (Doc. 92).

Defendants have not provided a valid reason for waiting this inordinate amount of time to file their spoliation motion. Defendants suggest that they were not aware of the significance of the ESI until plaintiffs filed their motion for partial summary judgment. (Doc. 92). Defendants' justification for their delay is not plausible. Plaintiffs' motion for partial summary judgment did not raise new claims and factual issues. Defendants should have known long before plaintiffs filed the motion what discovery they needed to conduct and what information they should obtain to respond to plaintiffs' motion and defend this lawsuit.

Further, while defendants argue that the spoliation motion is timely because it was filed just two months after the discovery cut-off, the cases defendants rely on for this proposition are distinguishable. For example, the Court in *Crown Battery Mfg. Co.*, 185 F. Supp.3d at 996, relied on "the fact that [the spoliation] motion preceded the summary-judgment deadline" as tending to show that the motion was timely. However, the court distinguished cases where "spoliation motions [] come as part of an opposition to summary judgment, or in a reply in support of a summary-judgment motion," finding that the case law teaches that these "are the ones that face timeliness problems." *Id.* (quoting *Goodman*, 632 F. Supp.2d at 507) (collecting cases)). Defendants here filed their spoliation motion in conjunction with their response to plaintiffs' motion for partial summary judgment. The timing of their motion therefore raises the very timeliness problem highlighted by the Court in *Crown Battery*. The other cases cited by defendants are likewise distinguishable and not persuasive. The case law does not support a finding in defendants' favor on the timeliness issue. Defendants here inexplicably waited to file their spoliation motion until after the discovery and dispositive motion deadlines had passed,

29

plaintiffs had filed a motion for partial summary judgment, and this case was on the eve of trial. The Court exercises its discretion to deny the motion on this alternative basis.

## IV. Motions for summary judgment

### A. Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield*, 295 F.3d at 615; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When

30

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [a video] recording remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011).

### B. Qualified immunity

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Boler v. Earley*, 865 F.3d 391, 416 (6th Cir. 2017) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). To defeat a claim of qualified immunity, the plaintiff must show that (1) the official's conduct violated a constitutional right, and (2) the right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).

### C. Fourth Amendment/False Arrest and False Imprisonment Claims (Counts II, III)

Defendants move for summary judgment on plaintiffs' claims alleging that defendants violated their constitutional rights by arresting plaintiffs without probable cause as required under the Fourth Amendment. Defendants argue that there was probable cause to arrest plaintiffs for (1) disorderly conduct, and (2) contempt of court. (Doc. 83 at 11-14, PAGEID#: 1167-70). Defendants do not address in their motion whether there was probable cause to arrest

31

plaintiff Enoch for failure to identify herself, although they suggest it was reasonable to detain her until her identity could be verified. (*Id.* at 13, PAGEID#: 1169). Defendants contend that a reasonable officer, with knowledge of the facts shown on the video evidence, would conclude that plaintiffs were guilty of the offenses charged.

Plaintiffs move for summary judgment on Counts II and III of the Amended Complaint, alleging claims for wrongful search and seizure under the Fourth Amendment (Count II) and false arrest/false imprisonment (Count III). (Doc. 84 at 20-31, PAGEID#: 1202-13). Plaintiffs contend that the video evidence and defendant Nobles' deposition testimony establish that there was no factual basis to arrest Enoch for (1) disorderly conduct under Ohio Rev. Code § 2917.11, and (2) failure to provide personally identifying information under Ohio Rev. Code § 2921.29. (Doc. 84 at 24-27, PAGEID#: 1206-09). Plaintiffs argue that the video evidence and Hogan's deposition testimony establish that there was no factual basis for Hogan to arrest plaintiff Corbin for disorderly conduct in violation of the Ohio statute. (Doc. 84 at 27-30, PAGEID#: 1209-12).

### *i. Fourth Amendment claim*

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. An arrest constitutes a seizure for Fourth Amendment purposes. *Wheeler v. Newell,* 407 F. App'x 889, 891 (6th Cir. 2011) (citing, *e.g., United States v. Torres-Ramos,* 536 F.3d 542, 554 (6th Cir. 2008)). An arrest does not violate the Fourth Amendment if it is based on probable cause. *Wheeler,* 407 F. App'x at 891 (citing *Whren v. United States,* 517 U.S. 806, 818-19 (1996); *United States v. Caicedo,* 85 F.3d 1184, 1192 (6th Cir. 1996)). In the absence of probable cause, an arrest constitutes an unreasonable seizure in violation of the Fourth Amendment. *Torres-Ramos,* 536 F.3d at 554 (citing *Ingram v. City of Columbus,* 185 F.3d 579, 592-93 (6th Cir. 1999)).

32

"A police officer has probable cause for arrest if, at the time the officer makes the arrest, 'the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense.'" *Osberry v. Slusher*, 750 F. App'x 385, 392 (6th Cir. 2018) (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (brackets omitted) (in turn quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Stated otherwise, there is probable cause only when the police officer "discovers reasonably reliable information that the suspect has committed a crime." *Id.* (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). "A probable cause determination is based on the totality of the circumstances, and must take account of both the inculpatory *and* exculpatory evidence then within the knowledge of the arresting officer." *Id.* (quoting *Gardenhire*, 205 F.3d at 318) (internal quotations omitted). "Moreover, the probable-cause determination must be based on the information that the arresting officer had when he made the arrest, 'rather than with the 20/20 vision of hindsight.'" *Id.* at 393-94 (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). *See also Dressler v. Rice*, 739 F. App'x 814, 819 (6th Cir. 2018), *cert. denied,* 139 S.Ct. 826 (2019) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (in turn quoting *Klein*, 275 F.3d at 550) ("A reviewing court must assess the existence of probable cause 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"). The inquiry requires the court to examine the events leading up to the arrest and then to decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause." *Torres-Ramos*, 536 F.3d at 554-55 (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003) (in turn quoting *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996)).

To determine if an arrest was supported by probable cause, the court employs a totality of the circumstances test and considers the evidence with respect to each person seized. *Id*. at 555. "Probable cause requires officers to 'show more than mere suspicion . . . [but] does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence to establish guilt beyond a reasonable doubt.'" *Id*. (quoting *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998)). Probable cause to arrest can be based on an officer's belief that the arrestee committed a crime, even if it is not the crime eventually charged. *Rainey v. Patton*, 534 F. App'x 391, 398 (6th Cir. 2013) (citing *Radvansky*, 395 F.3d at 307 n. 12). "Determining whether probable cause existed, 'presents a jury question, unless there is only one reasonable determination possible.'" *Radvansky*, 395 F.3d at 302 (quoting *Gardenhire*, 205 F.3d at 315).

Here, defendants arrested plaintiffs Corbin and Enoch for the crime of disorderly conduct in violation of Ohio Rev. Code § 2917.11(A). In Ohio, it is a misdemeanor crime for an individual to "recklessly cause inconvenience, annoyance, or alarm to another" by committing any of the five types of acts specified in the statute. Ohio Rev. Code § 2917.11(A)(1)-(5). A violation of the statute is a minor misdemeanor, with certain limited exceptions. Ohio Rev. Code. § 2917.11(E)(2). If the offender "persists in disorderly conduct after reasonable warning or request to desist" or commits the offense in a police officer's presence, it is a fourth-degree misdemeanor. Ohio Rev. Code § 2917.11(E)(3)(a), (c).

Ohio Revised Code § 2917.11 "requires two elements" for the commission of the offense of disorderly conduct. *Osberry*, 750 F. App'x at 394. To fulfill the first element, the individual must "recklessly cause inconvenience, annoyance, or alarm to another." *Id*. (quoting Ohio Rev. Code § 2917.11(A)). To fulfill the second element, "the person must cause this disturbance by

engaging in specific enumerated conduct" listed in the statute. *Id.* (quoting § 2917.11(A)(1)-(5)).

The specific conduct that satisfies the second element of a disorderly conduct charge is:

> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
> (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;
> (3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;
> (4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;
> (5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

Ohio Rev. Code § 2917.11.

Defendants argue that they had probable cause to arrest Enoch and Corbin for disorderly conduct. They allege that, "Deputy Hogan saw Plaintiff Enoch and Corbin appear to act in concert with each other and a third woman to block Reporter Perry's path in a public place and then begin chasing him when he turned to walk toward another public hallway. Plaintiff Corbin testified that he could see Reporter Perry was annoyed." (Doc. 83 at pp. 12-13, PAGEID#: 1168-69). Defendants argue that "[a]ny reasonable officer . . . would believe that [plaintiffs] were committing" disorderly conduct based on the "facts" that the video evidence establishes an officer would know, which are: plaintiffs Corbin, Enoch and Hunter's mother acted in concert; the three "effectively blocked Reporter Perry's right to walk in a public hallway"; "Reporter Perry was clearly annoyed"; plaintiffs started "chasing him" for no apparent reason; and plaintiffs' actions did not appear to have a lawful purpose. (Doc. 83 at pp. 12-13, PAGEID#: 1168-69). Defendants further contend that Hogan indicated to Nobles when Nobles arrived on the scene that "Enoch was involved in taking pictures," and Nobles was entitled to rely on this

information to handcuff plaintiff and take her to Room 260 because she would not identify herself. (Doc. 83 at p. 13, PAGEID#: 1169).

Defendants' version of the facts surrounding Corbin and Enoch's arrests as set forth in defendants' motion for summary judgment, their response to plaintiffs' motion for partial summary judgment, and their related memoranda are belied by their own deposition testimony and the video evidence. Hogan and Nobles' deposition testimony unequivocally establishes that there was no factual predicate for a disorderly conduct charge against either plaintiff. The undisputed facts to which the deputy sheriffs testified and which are confirmed by the video evidence show that there is no genuine issue of material fact that probable cause for a charge of disorderly conduct against either Corbin or Enoch was lacking.

First, Nobles' testimony establishes that there was no probable cause to arrest Enoch for disorderly conduct under Ohio Rev. Code § 2917.11. Nobles testified that at or around the time he arrested Enoch: (1) she was not engaging in fighting, threatening harm to persons or property, or engaging in violent behavior; (2) he does not remember that she was making unreasonable noise; he remembered she was not using offensive, coarse language or utterances, gestures or displays of any kind; and he does not remember that she used insulting language directed to anyone; (3) Enoch did not use taunting language directed to anyone that defendant Nobles observed; Nobles does not remember that she challenged anyone; and he did not know whether she engaged in any conduct that he observed or that he believed was likely to provoke a violent response from any person; (4) she did not do anything that would hinder or prevent the movement of any persons on a public street, road, highway or right of way; and (5) Enoch did not "do anything to interfere with the rights of others while [he] observed her," and he did not "observe her do anything that [he] believe[d] created a condition that was physically offensive to

persons or presented a risk of physical harm to persons at the time that [he] observed her." (Doc. 75, Nobles Depo., p. 67-69, PAGEID#: 596-98). Although Nobles wrote in his report at the time he cited her for disorderly conduct that plaintiff "[b]egan yelling at deputy while court was in session," he testified at his deposition that he does not recall Enoch yelling at any point and he believes Judge Nadel's court was not in session at that time. (Doc. 75, Nobles Depo., pp. 81-82, PAGEID#: 610-11).

Thus, according to Nobles' own testimony, Enoch did not commit any act that satisfies the elements of the offense of "disorderly conduct" under the Ohio statute. Nobles lacked probable cause to arrest Enoch for disorderly conduct and to cite her for a criminal offense under the statute.

Defendant Hogan gave testimony similar to that provided by defendant Nobles with respect to Corbin's arrest. Hogan described "everything that [he] observed that [he] believed constituted disorderly conduct by Mr. Corbin" at the time of his arrest in its entirety as follows: "When they wouldn't let [] Perry walk down the hallway, when they had their I-pads in his face," and "when he was asked to stop taking pictures because it was causing a disruption outside in the hallway." (Doc. 76, Hogan Depo., p. 54, PAGEID#: 708). Hogan did not specify who he meant by "they," but it appears he was referring to the group of people he originally described in his testimony as surrounding Perry and filming him, which included Corbin. (*See* Doc. 76, Hogan Depo., p. 48, PAGEID#: 702). Hogan acknowledged in his deposition testimony that Corbin eventually complied with his request to stop recording Perry, and Hogan had not placed Corbin under arrest at that point. (Doc. 76, Hogan Depo., p. 55, PAGEID#: 709). Hogan further testified that Corbin identified himself and produced his identification at Hogan's request, and at that point he had not placed Corbin under arrest. (Doc. 76, Hogan Depo., p. 55,

PAGEID#: 709). Hogan acknowledged after viewing two video recordings of the incident (Pl. Exhs. 9, 17) that he did not "see anything in the two videos . . . that would indicate that Mr. Corbin was prohibiting Mr. Perry from advancing or going anywhere he wasn't going to." (Doc. 76, Hogan Depo., p. 69, PAGEID#: 723). Hogan testified that to his knowledge, there were no other videos that he had seen that reflected this scene in a different light. (Doc. 76, Hogan Depo., p. 69, PAGEID#: 723). Hogan testified there was not anything that he observed Corbin do that he believed "was the basis for his arrest that did not appear on either of the two videos." (Doc. 76, Hogan Depo., p. 72, PAGEID#: 726). Hogan's revised testimony did not describe any conduct that could reasonably be construed as satisfying the elements of a disorderly conduct charge against Corbin.

To the extent there could be any doubt as to whether a reasonable officer could have found probable cause to charge Enoch or Corbin with disorderly conduct, the video recordings which captured the events described by Nobles and Hogan dispel any uncertainty as to what occurred in the entryway and hallways adjacent to Judge Nadel's courtroom after the recess in the *Hunter* proceedings on June 25, 2014. (See Doc. 81-16, Pl. Exh. 9; Doc. 81-30, Pl. Exh. 17[7]). The video recordings show several individuals standing in the area outside of the courtroom and Perry leaving the courtroom on the date of plaintiffs' arrests. As Perry exited the courtroom, Corbin was standing with his back against one of two pillars situated at the beginning of the hallway leading straight to and from the courtroom doors (the "main hallway"). Another hallway led off to the right. Corbin had his iPad pointed at Perry, who had a camera around his neck. Though Perry appeared to start walking down the adjacent hallway to the right as he

---

[7] Plaintiff's Exhibit 17 is a video recording of over four minutes in length and an audio report of Corbin's arrest which Perry posted on Cincinnati.com. The video shows both Corbin and Enoch's interactions with Hogan and Nobles and both plaintiffs' arrests.

stepped out of the courtroom, Perry turned slightly, held his hand up in a wave to someone in the main hallway, and walked in the direction of that hallway. Perry stopped in the entry area just short of the pillars at the entrance to the main hallway and stood within what appears to be no more than two feet of Corbin as Corbin continued to point his iPad at Perry. Corbin turned and took a step or two back from Perry as he continued video record Perry. Enoch can be seen walking past Perry and Corbin on the right toward the main hallway, around the pillar Corbin was standing against, and into main hallway where she stood between and a few steps back from the two pillars. Perry, who was standing opposite Enoch on the other side of the pillars, looked around for several seconds and then waved in Enoch's direction a few times. Enoch took a few steps to Perry's right. At this point, Enoch was still in the main hallway and on the opposite side of the pillars from Perry, and she was behind Corbin. Perry then turned and walked unimpeded down the Courthouse hallway to his right with his back to Corbin and Enoch. Plaintiffs walked behind Perry.

As Enoch and Corbin were following Perry down the hall, Hogan approached Enoch and told her to stop recording. Enoch stopped and closed her iPad. Hogan then approached Corbin and told him to turn his iPad off. Hogan can be heard in the video telling Corbin that recording is not allowed in the hallways of the Courthouse for security reasons. As Hogan is ordering Corbin to turn his iPad off, Perry can be seen standing a few feet in front of Corbin holding a camera with which he appears to be recording or taking pictures of Corbin as Hogan orders Corbin to turn off his iPad. Enoch testified that she could see that Corbin "had [] an iPad, and I can see that Kimball Perry had a camera and phone. . . ." (Doc. 78, Enoch Depo., p. 48, PAGEID#: 820). Hogan did not order Perry to turn off his recording device or to stop taking pictures in the hallway. When Nobles arrived during Hogan's interaction with Corbin, others

39

were using a recording device in the hallway, including two Caucasians who were filming with video cameras and two Caucasians who were recording or taking photographs with cell phones.

The video footage refutes defendants' allegations that plaintiffs surrounded Perry and chased him down the hallway of the Courthouse. The footage does not show either Enoch or Corbin "recklessly cause inconvenience, annoyance, or alarm to" Perry or to any other individual so as to satisfy the first element of Ohio Rev. Code § 2917.11(A). The video footage does not satisfy the second element of the offense of disorderly conduct because it does not depict either Enoch or Corbin "(1) [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior; (2) [m]aking unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person; (3) [i]nsulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response; (4) [h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender; or (5) [c]reating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender." Ohio Rev. Code § 2917.11(A). Nobles and Hogan did not testify that they relied on conduct other than what is shown by the video footage to charge Enoch and Corbin with disorderly conduct. The video footage establishes they did not have a reasonable, factual basis to arrest Enoch or Corbin for disorderly conduct.

Defendant Nobles testified that he arrested Enoch in part for her failure to identify herself under Ohio Rev. Code § 2921.29. (Doc. 75, Nobles Depo., p. 77, PAGEID#: 606). The statute provides:

40

(A) No person who is in a public place shall refuse to disclose the person's name, address, or date of birth, when requested by a law enforcement officer who reasonably suspects either of the following:

> (1) The person is committing, has committed, or is about to commit a criminal offense.
>
> (2) The person witnessed any of the following:
>
>> (a) An offense of violence that would constitute a felony under the laws of this state;
>>
>> (b) A felony offense that causes or results in, or creates a substantial risk of, serious physical harm to another person or to property;
>>
>> (c) Any attempt or conspiracy to commit, or complicity in committing, any offense identified in division (A)(2)(a) or (b) of this section;
>>
>> (d) Any conduct reasonably indicating that any offense identified in division (A)(2)(a) or (b) of this section or any attempt, conspiracy, or complicity described in division (A)(2)(c) of this section has been, is being, or is about to be committed.

Ohio Rev. Code § 2921.29. Nobles testified that before a person can be arrested for the fourth degree misdemeanor of failing to disclose their name, address or date of birth, a precondition specified in the statute for failure to identify must occur. (Doc. 75, Nobles Depo., pp. 72-73, PAGEID#: 601-02). Nobles testified that he arrested plaintiff and made the decision to charge her with disorderly conduct and failure to identify based on the complaints he had received, and the only complaint he could identify was defendant Hogan's complaint that Enoch was "taking pictures and recordings." (Doc. 75, Nobles Depo., pp. 77-78, PAGEID#: 606-607). Nobles testified that at the time he asked plaintiff to identify herself, he believed she had committed the crime of disorderly conduct, a precondition under the statute. (Doc. 75, Nobles Depo., p. 73, PAGEID#: 602); *see* Ohio Rev. Code § 2921.29(A)(1). However, on further questioning, Nobles conceded that "at the time [he] asked for identification [Enoch] had not, up to that point, engaged in disorderly conduct." (Doc. 75, Nobles Depo., p. 75, PAGEID#: 604). He further testified that plaintiff had not committed an offense of violence that would be considered a felony under Ohio law or conduct that would constitute any kind of felony. (Doc. 75, Nobles Depo., p. 76,

PAGEID#: 605). Nor had he observed Enoch engage in an attempt or conspiracy to commit any offense of violence that was a felony or any other felony. (Doc. 75, Nobles Depo., p. 76, PAGEID#: 605). Thus, Nobles did not have a reasonable suspicion that subsection (A)(1) or (2) of the statute was satisfied. Absent this element, Enoch's failure to disclose her identity at Nobles' request was not a criminal offense. Based on Nobles' own deposition testimony and the undisputed facts demonstrating that there was no basis to find a violation of Ohio Rev. Code § 2921.29 at the time of Enoch's arrest, only one conclusion is possible: Nobles did not have probable cause to arrest plaintiff for failure to disclose personally identifying information under Ohio Rev. Code § 2921.29.

Defendants also argue that even if the Court were to find there was no probable cause to arrest plaintiffs for disorderly conduct, there was probable cause to arrest plaintiffs for contempt of court under Ohio Rev. Code § 2705.02. (Doc. 83 at 14, PAGEID#: 1170). The Ohio contempt statute defines the criminal offense of contempt of court as the "[d]isobedience of, or resistance to, a lawful writ, process, order, rule, judgment or command of a court or officer." Ohio Rev. Code § 2705.02(A). Defendants argue they had probable cause to cite both Corbin and Enoch for contempt of court under § 2705.02 "for violating Rule 33 and not following commands to quit taking pictures," but they instead chose to cite Corbin for disorderly conduct and Enoch with disorderly conduct and failure to identify herself. (Doc. 83 at 8, 14, PAGEID#: 1164, 1170). Defendants' argument appears to be premised on their position that Local Rule 33 prohibited plaintiffs from taking videos and pictures with their iPads in the hallways of the Courthouse; plaintiffs violated Local Rule 33 by taking pictures and video recordings in the hallways on the date of their arrests; and plaintiffs' alleged violations of Local Rule 33 and their purported refusal to stop using their iPads to take pictures or to record in the hallways when

42

instructed by the officers to do so constitutes contempt of court under § 2705.02.

Plaintiffs argue that defendants did not arrest them for violating Local Rule 33, and neither did defendants have probable cause to arrest them for violating the Rule. (Doc. 84 at 11, PAGEID#: 1193; Doc. 96 at 10-15, PAGEID#: 1801-06). They contend that Local Rule 33 did not proscribe the use of iPhones or recording devices in the hallways of the Courthouse, and Judge Nadel, as presiding judge of the *Hunter* trial, never issued a written or verbal order prohibiting their use in the hallways. (Doc. 96 at 10-15).

The parties dispute whether defendants arrested plaintiffs for violating Local Rule 33. Hogan testified that he believed Corbin was violating Local Rule 33(D)(6) at the time he arrested him in the hallway. (Doc. 76, Hogan Depo., p. 71, PAGEID#: 725). Nobles testified that he arrested Enoch based on complaints he received that she was "taking pictures and recordings." (Doc. 75, Nobles Depo., p. 78, PAGEID#: 607). Because probable cause to arrest can be based on an officer's belief that the arrestee committed a crime, even if it is not the crime eventually charged, the Court will assume for summary judgment purposes that a basis for plaintiffs' arrests was violations of Local Rule 33. *See Rainey*, 534 F. App'x at 397-99. Whether defendants had probable cause to arrest plaintiffs for violating Local Rule 33 hinges in large part on the scope of the Rule, which involves factual determinations. As the Sixth Circuit explained in deciding defendants' appeal of this Court's prior decision:

> By its text, Local Rule 33(D)(6) prohibits recording "in any courtroom or hearing room, jury room, judge's chambers or ancillary area (to be determined in the sole discretion of the Court) without the express permission of the Court." The scope of Rule 33 does not present a purely legal question because the text of the rule is not dispositive. The enumerated list of covered areas does not include hallways, nor are hallways necessarily an "ancillary area." The invocation of "the sole discretion of the Court" further muddies the waters because it appears that *judges must make periodic determinations as to what constitutes an ancillary area*-and perhaps, as the magistrate judge tentatively opined, as to what constitutes any of

43

the areas in the list. *Whether such judicial determinations were made and what areas of the courthouse they covered at what times are factual*, not legal, questions.

*Enoch*, 728 F. App'x at 454 (emphasis added).

The evidence produced by the parties shows there is no genuine issue of material fact on the scope of Local Rule 33(D) as it pertains to this lawsuit. Judge Nadel, the judge who presided at the *Hunter* trial, testified that he did not reference "hallways" in the instructions he gave in his courtroom regarding the issue of cell phones or recording proceedings. (Doc. 88-1, Nadel Depo., pp. 27-29, PAGEID#: 1440-42). Judge Nadel also did not recall putting on an order in the *Hunter* case that specifically defined "ancillary areas," but he testified that the record would accurately reflect any orders he issued or instructions he gave. (Doc. 88-1, Nadel Depo., pp. 16-17, 20, 21-22, 32, PAGEID#: 1429-30. 1433, 1434-35, 1445).[8] The transcript of Judge Nadel's verbal instructions to individuals in the courtroom regarding photographs and video recordings does not mention hallways. (Doc. 75, Nobles Depo., pp. 122-123, PAGEID#: 651-52; Doc. 81-19, Defts. Exh. 3).

Defendant Nobles was not aware of any instructions from Judge Nadel that prohibited picture taking or recording in the hallways of the Courthouse. (Doc. 75, Nobles Depo., pp. 27-29, PAGEID#: 556-558). Nobles does not know if Judge Nadel gave any instructions or orders regarding the use of recording devices at any other time during the *Hunter* trial. (Doc. 75, Nobles Depo., pp. 29, PAGEID#: 558). Enoch recalled Judge Nadel instructing individuals in

---

[8] At his deposition, Judge Nadel testified he considered "the hallway, any adjacent areas to be ancillary to the courtroom" and thought his order implied that. (Doc. 88-1, Nadel Depo., pp. 21, 29-30, PAGEID#: 1434, 1442-1443). Importantly, Judge Nadel, who had the "sole discretion" to determine and define what constituted "ancillary areas," never verbalized his apparent assumption or issued a written order designating the hallways of the Courthouse to be "ancillary" under Rule 33. As the Sixth Circuit previously noted, the text of Rule 33(D)(6) does not include "hallways" among the specific areas where photography or recording is prohibited. *Enoch*, 728 F. App'x at 454. "[N]or are hallways necessarily an 'ancillary area.'" *Id*. An area is considered "ancillary" when the judge, in his or her "sole discretion," makes a specific determination that it is. Judge Nadel made no such determination in the *Hunter* case.

the courtroom that "if you need to use your . . . cell phones, then . . . you need to step out into the hallway," and that if individuals had their cell phones out "they would be confiscated." (Doc. 78, Enoch Depo., p. 51, PAGEID#: 823). Defendant Hogan testified that up to the time he arrested plaintiff Corbin, he had not seen "any written orders or entries from Judge Nadel that specifically prohibited recording in the hallways." (Doc. 76, Hogan Depo., p. 58, PAGEID#: 712). Hogan never saw a directive from Judge Nadel describing "ancillary areas" under Local Rule 33(D)(6) as they would relate to a prohibition on recording during the *Hunter* trial. (Doc. 76, Hogan Depo., pp. 71-72, PAGEID#: 725-726). Finally, although there was a sign on Judge Nadel's courtroom door that prohibited "the use of cell phones, pagers, cameras, electronic devices . . . without permission of the court," there is no testimony or other evidence that the prohibition listed on the sign applied to areas other than the courtroom. (Doc. 84-11, Pltfs. Exh. 11, PAGEID#: 1236). Nor was the sign sufficient in and of itself to convey a prohibition on the use of cell phones and electronic devices in the hallway. The sign was directly below another sign with the heading, "THE COURTOOM," and the sign referenced Local Rule 33(D)(6) but did not specify any ancillary areas that were covered by the prohibition. (*Id.*).

Thus, defendants have not produced evidence to show there is a genuine issue of material fact on the issue of the scope of Local Rule 33(D)(6), which prohibits recording "in any courtroom or hearing room, jury room, judge's chambers or ancillary area (to be determined in the sole discretion of the Court) without the express permission of the Court." The undisputed evidence shows that on the date of plaintiffs' arrests, Judge Nadel had not, in his sole discretion, prohibited any individuals, including Corbin and Enoch, from taking photographs or video recordings with a cell phone or iPad in the hallways adjacent to Judge Nadel's courtroom. It necessarily follows that probable cause to arrest either Corbin or Enoch for violating Local Rule

33 was lacking.

In summary, defendants have proffered three possible bases for plaintiffs' arrests: disorderly conduct in violation of Ohio Rev. Code § 2917.11; failure to provide personal identifying information in violation of Ohio Rev. Code § 2921.29(A)(1); and contempt of court in violation of Ohio Rev. Code § 2705.02. Defendants have not produced evidence to show there is a genuine issue of material fact as to whether deputy sheriffs Nobles and Hogan had probable cause to believe defendants had violated any of these statutes. The deposition testimony of the parties and Judge Nadel and the video recordings that have been produced in this lawsuit refute defendants' allegations that plaintiffs' actions in the hallway of the Courthouse satisfied the elements of the Ohio statutes which criminalize disorderly conduct, failure to disclose personal identifying information, or contempt of court. The evidence establishes that the material facts underlying plaintiffs' Fourth Amendment claim for unlawful search and seizure are undisputed. Defendants Hogan and Nobles arrested plaintiffs without probable cause in violation of their Fourth Amendment rights.

Defendants are not entitled to qualified immunity on plaintiffs' Fourth Amendment claims for unreasonable search and seizure. As of June 2014, those rights were clearly established such that a reasonable official would understand that to conduct a search and seizure without probable cause violated an individual's Fourth Amendment rights. *See, e.g., Ingram v. City of Columbus,* 185 F.3d 579, 592-93 (6th Cir. 1999). As the Sixth Circuit noted in its previous qualified immunity ruling in this case, "Even assuming for the sake of argument that the initial stops of Enoch and Corbin were brief and investigative in nature, probable cause was required for the arrests and prosecutions that followed those stops." *Enoch,* 728 F. App'x at 454 (citing *Sykes v. Anderson,* 625 F.3d 294, 305, 308 (6th Cir. 2010)).

*Bennett v. Schroeder*, 99 F. App'x 707 (6th Cir. 2004), cited by defendants in support of their qualified immunity defense, is inapposite. In *Bennett*, a protester was mistakenly charged with assaulting a police horse based on the erroneous belief that the protester had pushed the horse. The correct charge was disorderly conduct based on the protestor's numerous refusals to remain behind a barricade. As soon as the officer, who did not sign the original charge, became aware of the incorrect charge he immediately notified the prosecutors to inform them of the mistake. The Sixth Circuit determined the charging officer was entitled to qualified immunity under these circumstances. As the Sixth Circuit had previously recognized, "the fact that an officer made an incorrect charge initially does not mandate a finding of no probable cause to present another charge growing out of the same incident." *Id.* at 715 (citing *Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997)). Because the factual predicate for a disorderly conduct charge was specifically included in the "Facts of Arrest" section of the Arrest and Investigation Report, and the facts and circumstances surrounding the protestor's arrest were sufficient to lead a reasonably prudent police officer to believe the protestor had committed a disorderly conduct offense, the Sixth Circuit concluded that the officer was properly granted qualified immunity:

> Here, the undisputed record evidence is that disorderly conduct was the crime with which Officer Schroeder had thought all along Plaintiff had been charged. It was only upon receiving the "Notify" of the trial that he was made aware that Plaintiff had been erroneously charged with assaulting a police horse and, as indicated above, Schroeder acted immediately to rectify the situation. Under the circumstances presented in this case, we find that Officer Schroeder is entitled to qualified immunity.

*Bennett*, 99 F. App'x at 716.

Here, in contrast, there is no allegation that plaintiffs were mistakenly charged with disorderly conduct instead of contempt of court. Both Hogan and Nobles were the charging officers who issued the citations to Enoch and Corbin and determined which offenses to charge. Moreover, unlike *Bennett*, there is no factual dispute that there was no probable cause for either

of the offenses actually charged (disorderly conduct in violation of Ohio Rev. Code § 2917.11 and failure to provide personal identifying information in violation of Ohio Rev. Code § 2921.29(A)(1)) or the offense that was not charged (contempt of court in violation of Ohio Rev. Code § 2705.02). As it was clearly established at the time of plaintiffs' arrests that an arrest in the absence of probable cause violates the Fourth Amendment, *Rainey*, 534 F. App'x at 399 (and cases cited therein), defendants Hogan and Nobles are not entitled to qualified immunity.

### ii. False arrest/false imprisonment

Plaintiffs move for summary judgment on their claims under the Fourth Amendment for false arrest/false imprisonment. (Doc. 84 at 20-31, PAGEID#: 1202-13). To state a claim for false arrest under § 1983, a plaintiff must prove that the arresting officer did not have probable cause to arrest the plaintiff. *Rainey*, 534 F. App'x at 397-99 (citing *Radvansky*, 395 F.3d at 302, 307 n. 12). For the reasons discussed in connection with plaintiffs' Fourth Amendment claim for unreasonable search and seizure, defendants have not produced evidence to create a genuine issue of fact as to whether they had probable cause to arrest plaintiffs. The law on probable cause was well-established as of June 2014. Plaintiffs are entitled to summary judgment as a matter of law on their claims for false arrest/false imprisonment.

### D. First Amendment claims

Plaintiffs bring First Amendment claims for violation of their right to free speech based on their detention/arrest and search and seizure of their iPads, which they allege occurred without a warrant or probable cause and in a racially discriminatory manner. (Count I).[9]

---

[9] Plaintiffs do not seek summary judgment on their claim that there was racial animus in defendants' decisions to arrest and detain plaintiffs, who are both African-American, for recording the events in the Courthouse hallways while allowing white individuals to record without any interference. While the video evidence shows white individuals recording events in the hallways with professional video cameras as well as cell phones, plaintiffs acknowledge that defendants have denied any racial animus, thereby creating an issue of fact on the issue of intent. (Doc. 84 at 16, n.5, PAGEID#: 1198).

Defendants move for summary judgment on plaintiffs' claims for violation of their First Amendment rights. (Doc. 83 at 17-19, PAGEID#: 1173-75). They contend that plaintiffs did not have a First Amendment right to use recording devices in hallways outside courtrooms in the Hamilton County Courthouse. They argue that under Judge Nadel and Kimball Perry's interpretation of Local Rule 33, "unauthorized photographing" was prohibited in the hallways. (*Id.* at 17). Defendants have submitted the Declaration of Gary Wolfzorn, a Sergeant with the Hamilton County Sheriff's Office, to show that individuals have been found in contempt and sentenced for violating the Rule. (Doc. 83-1, p. 1-5, PAGEID#: 1178). In his affidavit, Wolfzorn states he is "personally aware of numerous instances where individuals have been found in contempt of court for using devices to photograph people in the hallways," and he has attached two Court of Common Please entries "finding individuals in contempt and sentencing them to jail for violating the Court's policy." (*Id.*). The first contempt entry was issued by a Common Pleas judge against an individual who made a video recording of police officers who were witnesses in felony indictments, one of whom frequently worked in an undercover capacity. (*Id.*, Exh. A). The second contempt entry was issued by a Common Pleas judge against an individual who took a photograph of a sheriff's deputy escorting a defendant out of the courtroom against the direct order of the court. (*Id.*, Exh. B). Defendants contend that Local Rule 33 is consistent with Southern District of Ohio Rule 83.2(a), and that "[t]here is no case or controlling authority finding Local Rule 33 and the interpretation of it by the Hamilton County Court of Common Pleas invalid or unconstitutional." (Doc. 83 at 17, PAGEID#: 1173). Defendants contend that Judge Nadel interpreted the Rule to always extend to hallways outside his courtroom; advance permission is required to film in those ancillary areas; and plaintiffs

"Corbin and Enoch appeared to be using their iPads to annoy Reporter Perry by blocking his path and chasing after him." (*Id.*).

Plaintiffs also move for summary judgment on the First Amendment claim. Plaintiffs allege that they were arrested and detained solely because they attempted "to record events associated with the prosecution of Judge Tracie Hunter," an exercise of "their First Amendment right to gather news and information of public import." (Doc. 84 at 15, PAGEID#: 1197). Plaintiffs allege that they were prevented "from recording and gathering news and information regarding such a high-profile trial" as a result of their arrests and the "confiscation of their iPads during their subsequent detention." (*Id.*). Plaintiffs allege that defendants violated their rights by creating a limited public forum where the media and the public could interview lawyers and parties coming out of the courtrooms or otherwise record such public events immediately outside the courtrooms of the Courthouse. (Doc. 84 at 16, PAGEID#: 1198). Plaintiffs allege that defendants violated well-established law by discriminating against speakers within the limited public forum. (Doc. 84 at 16-19, PAGEID#: 1198-99). Plaintiffs allege that defendants' acts of singling them out to stop photographing and recording while permitting many other individuals to record events unhindered "contravenes this constitutional principle." (Doc. 84 at 18, PAGEID#: 1200). Plaintiffs allege the analysis would yield the same result if the hallways of the Courthouse were a non-public forum. (*Id.*).

The First Amendment guarantees the right "of free people to express themselves without unjustified governmental restriction." *McGlone v. Metro. Govt. of Nashville*, 749 F. App'x 402, 404-05 (6th Cir. 2018). First Amendment. U. S. Const. amend. I. ("Congress shall make no law . . . abridging the freedom of speech. . . ."). The First Amendment's free speech protections apply against the states and their political subdivisions. *Id.* (citing *Gitlow v. New York*, 268 U.S. 652,

666 (1925); *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938)). Courts undertake a three-part inquiry in determining whether an individual's First Amendment free speech rights have been violated: "(1) whether the allegedly excluded speech is protected under the First Amendment; (2) the nature of the forum in which the speech was to take place; and (3) whether the government's exclusion is justified under the requisite standard." *Id.* (citing *Cornelius v. NAACP Legal Defense and Educ. Fund.*, 473 U.S. 788, 797 (1985); *Saieg v. City of Dearborn*, 641 F.3d 727, 734-35 (6th Cir. 2011)).

A government entity may create a *limited* public forum that is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009)). The government entity may restrict speech in a limited public forum as long as the restrictions do "'not discriminate against speech on the basis of viewpoint' and are 'reasonable in light of the purpose served by the forum.'" *Id.* at 534 (citing *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 102-03, 106-07 (2001); *Summum,* 129 S.Ct. at 1132). *See also Christian Leg. Soc. Chapter of the U. of California, Hastings College of the L. v. Martinez*, 561 U.S. 661, 679 (2010).

In contrast to a limited public forum, a *nonpublic* forum is "a publicly-owned property that is not by tradition or governmental designation 'a forum for public communication.'" *Miller,* 622 F.3d at 534 (quoting *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007)). Access to a nonpublic forum may be limited by the government "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* (quoting *Cornelius,* 473 U.S. at 806). Government limitations on speech in both a limited public forum and a nonpublic forum therefore receive the

same level of scrutiny: government restrictions must be "reasonable and viewpoint neutral." *Id.* at 536 (quoting *Summum,* 129 S.Ct. at 1132; citing *Helms,* 495 F.3d at 256).

Here, in determining whether plaintiffs' First Amendment rights have been violated, the Court must first examine whether the allegedly excluded speech is protected under the First Amendment. It is undisputed that "the First Amendment protects the rights of both the media and the general public to attend and share information about the conduct of trials, 'where their presence historically has been thought to enhance the integrity and quality of what takes place.'" *Enoch,* 728 F. App'x at 456 (citing *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 578 (1980)). Plaintiffs satisfy the first element of the three-part inquiry. *McGlone,* 749 F. App'x at 405.

Second, plaintiffs contend, and defendants do not dispute, that the hallways of the courthouse are a limited public forum. The public has access to the hallways, but the hallways are not "as open to public discourse as a sidewalk or park," and regulations such as Local Rule 33 permit the judges to limit expressive activities of the public in the hallway. *Miller,* 622 F.3d at 535 ("by opening the interior spaces of Cincinnati's city hall to private groups under the aegis of Administrative Regulation #5, the City has not created a traditional public forum because the regulation does not make City Hall's interior space as open to public discourse as a sidewalk or park."). Treating the hallways as a limited forum public is appropriate under the facts of this case.

Third, because the hallways are a limited public forum, the Court examines whether defendants' restrictions on plaintiffs' expressive activities do "not discriminate against speech on the basis of viewpoint" and are "reasonable in light of the purpose served by the forum." *Miller,* 622 F.3d at 535. Defendants' arguments in support of their motion for summary judgment on

this point miss the mark. Defendants cite several cases for the proposition that there is no unfettered First Amendment right to enter a courthouse, to photograph witnesses and jurors inside a courthouse, or to hold demonstrations near a courthouse. (Doc. 83 at 18-19, PAGEID#: 1174-75, collecting cases). However, the right to impose restrictions is not at issue here. The issue is whether any restrictions that were imposed were reasonable and applied in a non-discriminatory manner. *McGlone*, 749 F. App'x at 405; *Miller*, 622 F.3d at 534.

There is no evidence that defendants took any adverse action against plaintiffs based on plaintiffs' viewpoints. Indeed, defendants contend they were simply enforcing Ohio law and Local Rule 33(D)(6) in arresting plaintiffs and confiscating their electronic devices. The question then becomes whether defendants' actions were reasonably related to the purpose of the forum in light of the circumstances and evidence in this case. As discussed above, there are no material factual disputes that defendants Hogan and Nobles had no probable cause to arrest plaintiffs or confiscate their iPads and cell phones. Thus, the Court cannot conclude that defendants' suppression of plaintiffs' speech in this case was reasonably related to enforcing the laws prohibiting disorderly conduct under Ohio Rev. Code § 2917.11, the failure to disclose personally identifying information under Ohio Rev. Code § 2921.29, or contempt of court under Ohio Rev. Code § 2705.02. Moreover, there were other individuals in the Courthouse hallways at the same time as plaintiffs who were using recording devices and cell phones in the same manner as plaintiffs. However, none of these individuals were prohibited from recording events in the hallways. The Court concludes there are no material issues of fact as to whether defendants violated plaintiffs' First Amendment rights by detaining them and seizing their iPads.

The Court further concludes that defendants are not entitled to qualified immunity on plaintiffs' First Amendment claims. The Sixth Circuit has previously determined that the deputy

53

sheriffs in this case "could not constitutionally prevent Enoch and Corbin from or punish them for gathering news about matters of public importance when their actions violated neither rules nor laws" and "[t]hose rights were clearly established." *Enoch*, 728 F. App'x at 456. Because the undisputed evidence of record establishes the plaintiffs violated no rules or laws in attempting to record public events in the hallways of the Courthouse, defendants do not enjoy qualified immunity on this claim. Thus, plaintiffs are entitled to summary judgment on their First Amendment claims.

## E. Official Capacity Claims against Sheriff Neil, Defendants Hogan and Nobles, and the Hamilton County Sheriff's Office

Plaintiffs seek summary judgment against Hamilton County on their First Amendment claims. Plaintiffs assert that defendants Hogan and Nobles followed an official policy of the Hamilton County Sheriff's Office in arresting plaintiffs and in preventing plaintiffs from using their recording devices and, therefore, the County is liable for the constitutional violations in this case. Defendants also seek summary judgment on the official capacity claim, alleging that the official policy set forth in Local Rule 33 was created not by the Sheriff's Department but by the Hamilton County Court of Common Pleas and its judges, who are not defendants in this case. Defendants contend that because the Sheriff was not responsible for creating Local Rule 33, there is no policy or custom upon which to premise County liability in this case.

The claim against Sheriff Neil in his official capacity, the individual deputies in their official capacities, and the Hamilton County Sheriff's Department is in reality an official capacity claim against Hamilton County, the entity of which defendants are agents. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978). *See also Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989). "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

54

Municipalities and counties are not vicariously liable for the actions of their employees under §

1983, and it is well-established that a county "cannot be held liable under § 1983 for an injury

inflicted solely by its employees or agents." *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441

(6th Cir. 2000) (citing *Monell*, 436 U.S. at 694). To establish their claim for relief against

Hamilton County for their alleged injuries, plaintiffs must show that "those injuries were the

result of an unconstitutional policy or custom of the County." *Matthews v. Jones*, 35 F.3d 1046,

1049 (6th Cir. 1994). *See Monell*, 436 U.S. at 694; *Doe v. Claiborne County*, 103 F.3d 495, 507

(6th Cir. 1996). *See also Polk County v. Dodson*, 454 U.S. 312 (1981) (municipal policy must be

"moving force" behind constitutional deprivation). "The 'official policy' requirement [of

*Monell*] was intended to distinguish acts of the *municipality* from acts of *employees* of the

municipality, and thereby make clear that municipal liability is limited to action for which the

municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)

(emphasis in original). Counties and other governmental entities cannot be held responsible for a

constitutional deprivation unless there is a direct causal link between a policy or custom and the

alleged deprivation. *Monell*, 436 U.S. at 691; *Deaton v. Montgomery County, Ohio*, 989 F.2d

885, 889 (6th Cir. 1993). Plaintiffs must identify the county custom or policy that allegedly

resulted in a violation of their federal rights, "connect the policy to the [County] itself and show

that the particular injury was incurred because of the execution of that policy." *Graham ex rel.*

*Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). A plaintiff may

demonstrate the existence of an unconstitutional policy or custom by looking to: "(1) the

municipality's legislative enactments or official agency policies; (2) actions taken by officials

with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a

custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of*

*Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Neither plaintiffs nor defendants are entitled to summary judgment on the official capacity claim in this case. There are genuine issues of fact as to the existence of a County policy that allegedly led to the arrests of plaintiffs for using their electronic recording devices in the Courthouse hallways and the seizure of those devices, thereby preventing them from recording the newsworthy events of the day and exercising their First Amendment rights.

Hogan testified that it was his understanding that an individual "cannot record or photograph in the hallways of the courthouse" unless they have the permission of the court to do so. (Doc. 76, Hogan Depo., pp. 73-4, PAGEID#: 727-728). Hogan testified that his understanding was based on the "FTO" (Field Officer Training) training he had received, during which he was instructed by Rob Weber that people are not allowed to film inside the courthouse without permission and if they are filming, "we just ask them to step outside and they can film out front." (Doc. 76, Hogan Depo., p. 74, PAGEID#: 728). Hogan testified that this was his understanding of the Sheriff's Office policy at the time. (Doc. 76, Hogan Depo., p. 74, PAGEID#: 728). Nobles testified that he arrested Enoch based on the complaint from defendant Hogan that she was taking pictures, which he received before he arrived in the area. (Doc. 75, Nobles Depo., pp. 105-106, PAGEID#: 634-35).

Defendant Neil agreed that in their "handling of Ms. Enoch and Mr. Corbin," the deputies "were acting in accord with the sheriff's departmental policies" and not "acting in a rogue fashion" at the time of the arrests. (Doc. 74, Neil Depo., p. 8, PAGEID#: 485). However, when he was asked to describe the departmental policy, Neil stated:

> That is actually policy of the court. The Court of Common Pleas, the judges and the administrator of the court, work in conjunction with the sheriff's office for security matters, but it's actually -- this is an order from the court, not the sheriff's office. And Rule 33 was not produced – was not written by a deputy sheriff, it's from the Court of Common Pleas.

(*Id*.). Sheriff Neil testified with respect to the "ancillary areas" clause of Rule 33 that "the judge does determine what areas are ancillary areas." (Doc. 74, Neil Depo., p. 8, PAGEID#: 485). Defendant Neil testified that the Rule means that the "judge has to spell it out, you know, what areas are prohibited for using devices." (Doc. 74, Neil Depo. p. 34; and *see* Pl. Ex. 7, Local Rule 33).

Sheriff Neil was also asked about defendant Hogan's testimony that there was a policy of no filming in the courthouse without the permission of a judge, on which Hogan was instructed during the Sheriff's Field Officer Training. ((Doc. 74, Neil Depo. pp. 11-12; PAGEID#: 488-489). When asked whether that was actually his policy, Neil stated:

> Not working in court services, I was not field trained in that area. But we do have field training officers assigned in all areas of the sheriff's operation to prepare deputies that work in set areas for their duties.

(Doc. 74, Neil Depo., p. 12, PAGEID#: 489). Defendant Neil testified he was not aware of a Sheriff's Office policy that covers filming in the Courthouse, "but it might be a policy of -- established by, you know, the Court of Common Pleas. But I'm not aware of a sheriff's office -- I'm sorry, I'm not aware of a sheriff's office policy." (Doc. 74, Neil Depo., p. 15, PAGEID#: 492). Neil reiterated that he never worked in court services and was more familiar with the patrol function policies "[b]ecause we have policies and procedures that direct us in all of our different work areas." (Doc. 74, Neil Depo., p. 15, PAGEID#: 492).

There is an issue of fact as to the existence of a Sheriff's policy prohibiting filming or photography in the Courthouse wholly apart from Local Rule 33(D)(6), which prohibits filming and recording only in ancillary areas expressly defined by the court. Plaintiffs do not challenge the validity or scope of Local Rule 33. (Doc. 98 at 14, PAGEID#: 1847).[10] Rather, plaintiffs

---

[10] To the extent defendants claim they are entitled to Eleventh Amendment immunity because they were enforcing Local Rule 33, a policy of the Court of Common Pleas which is an arm of the State of Ohio (Doc. 83 at 16), they are

challenge the "Sheriff's office policy of prohibiting use of [electronic recording] devices anywhere in the Courthouse without permission." (*Id.*). Defendant Hogan testified that standard training for Sheriff's Deputies assigned to court services was to prohibit photographing or videotaping anywhere in the Courthouse without permission. Sheriff Neil was not aware of any such policy, but his testimony does not foreclose the possibility that there was a custom or practice followed by the deputies assigned to court services in arresting plaintiffs for filming in the hallways of the Courthouse. Neil's testimony suggests that he was not familiar with the training received by court services officers, and there are policies and procedures that direct the conduct of officers in the different areas to which deputies are assigned. County liability may be premised upon a custom of the Sheriff's Department, even if the custom is not officially approved by the Sheriff or County. *See Pembaur*, 475 U.S. at 481 n.10, 482-83. Whether defendants Hogan and Nobles arrested plaintiffs for filming or photographing under the policy described by Hogan is a question of fact that cannot be resolved on summary judgment. Moreover, regardless of whether Sheriff Neil endorsed or ratified the actions of Deputies Hogan and Nobles (Count VI), which he testified were in accordance with departmental policy of the Sheriff's office (Doc. 74, Neil Depo., p. 8, PAGEID#: 485), there is an issue of fact as to what that policy was. Summary judgment is likewise denied on this claim.

## F. Defendants are not entitled to summary judgment on the remaining claims.

Count V of the Amended Complaint alleges a claim for malicious prosecution. Defendants assert they are entitled to summary judgment on this claim because there was

---

mistaken. Plaintiffs are not challenging the validity or enforcement of Local Rule 33. They allege that the Rule does not apply in this case because there was never a judicial determination that prohibited recording in the ancillary areas/hallways of the Courthouse. Rather, plaintiffs assert there is a Sheriff's Department policy that was enforced by defendants Nobles and Hogan which resulted in the deprivation of plaintiffs' constitutional rights. As fully explained in this Court's ruling on the Eleventh Amendment defense raised by defendants in their motion for judgment on the pleadings, defendants were not acting as State officers and are not entitled to Eleventh Amendment immunity. (Doc. 61 at 18-22, PAGEID#: 376-80).

probable cause for plaintiffs' arrests. (Doc. 83 at 19, citing *Webb v. U.S.*, 789 F.3d 647 (6th Cir. 2015)). For the reasons discussed above, the Court determines that defendants lacked probable cause to arrest plaintiffs. Therefore, defendants' motion for summary judgment on this claim is denied.

Count VIII alleges state law claims for negligent and intentional infliction of emotional distress. In Count X, plaintiff Enoch alleges a state law claim for invasion of privacy based on defendants' search of the contents of her iPad. Defendants contend they are immune under Ohio law for intentional and negligent torts under the circumstances of this case unless the facts show they acted with a malicious purpose, in bad faith, or in a wanton or reckless manner. (Doc. 83 at 20, PAGEID#: 1176). *See* Ohio Rev. Code § 2744.03(A)(6). They argue that because there was probable cause for plaintiffs' arrests, "any emotional distress caused was not done with malicious purpose, in bad faith, or recklessly." (Doc. 83 at 20). As discussed above, the Court determines there was no probable cause to arrest plaintiffs for their actions on June 25, 2014. As this is the sole basis for defendants' claim of statutory immunity, their motion for summary judgment on Count VIII is denied.

Defendants also contend that Enoch "consented to a brief look at her iPad screen" when she was initially stopped and no examination of the iPad occurred once it was confiscated. (*Id.*). There are disputes of fact as to whether Enoch consented to an examination of her iPad when first approached by Nobles. Consent to search must be given freely and voluntarily and untainted by any duress or coercion on the part of law enforcement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973); *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). Plaintiff testified that she initially refused to hand over her iPad but then relented under the threat of arrest. (Doc. 78, Enoch Depo. at 50, PAGEID:# 822). Enoch's testimony raises a question of

fact as to whether the search of her iPad by Nobles was consensual or coerced. Defendants have not shown they are entitled to statutory immunity on Count X.

Finally, the Court notes that plaintiffs allege they were arrested and their electronic recording devices were confiscated in a racially discriminatory manner. The evidence of record indicates that Enoch and Corbin, who are African American, were the only individuals who were arrested for filming or recording in the Courthouse hallways on June 25, 2014, while white individuals were not. This evidence provides a sufficient basis for a jury to infer the requisite malicious purpose, bad faith, or wanton or reckless conduct on the part of defendants, which would vitiate statutory immunity in this case. Defendants' motion for summary judgment on the remaining counts is denied.

In conclusion, the Court: (1) DENIES defendants' motion for sanctions for spoliation; (2) GRANTS plaintiffs' motion for summary judgment on plaintiffs' First and Fourth Amendment claims (Counts I, II, and III); and (3) DENIES defendants' motion for summary judgment in all respects.

Date: 4/19/19

Karen L. Litkovitz
United States Magistrate Judge